UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CIV. ACTION NO.: 15-22380 KMM

L.T. Case No.: 13-14289- RAM

SAMUEL D. ROSEN,

Appellant,

v.

THOMAS L. ABRAMS,

Appellee.

ON APPEAL FROM ORDERS OF THE U.S. BANKRUPTCY COURT OF THE SOUTHERN
DISTRICT OF FLORIDA

**NOTICE OF FILING AFFIDAVIT OF APPELLANT, SAMUEL D. ROSEN**

Douglas C. Broeker, Esq.
Florida Bar No. 306738
**SWEETAPPLE, BROEKER & VARKAS, P. L.**
44 W. Flagler Street, Suite 1500
Miami, Florida 33130
Tel.: (305) 374-5623
Fax: (305) 358-1023
docservice@broekerlaw.com
doug@broekerlaw.com
*Counsel for Appellant*

## <u>NOTICE OF FILING AFFIDAVIT OF APPELLANT, SAMUEL D. ROSEN</u>

Appellant, SAMUEL D. ROSEN ("Rosen"), by and through undersigned counsel, hereby

gives Notice of Filing of the Affidavit of Rosen dated February 16, 2016.

Dated: March 4, 2016.

Respectfully submitted,

By:     /s/ Douglas C. Broeker
          Douglas C. Broeker, Esq., *Appellate Counsel*
          Florida Bar No. 306738
          **SWEETAPPLE, BROEKER & VARKAS, P.L.**
          44 W. Flagler Street, Suite 1500
          Miami, Florida 33130
          Tel.: (305) 374-5623
          Fax: (305) 358-1023

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case and via Regular U.S. Mail to all parties who are not on the list to receive e-mail notification/service for this case on this 4th day of March, 2016.

*I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-I (A).*

By:     /s/ Douglas C. Broeker
        **Douglas C. Broeker, Esq.**
        Florida Bar No. 306738
        Doug@broekerlaw.com
        DocService@broekerlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

---

CIV. ACTION NOs.: 15-cv-23437-KMM and 15-cv-24523-KMM

L.T. Case No.: 13-14289- RAM

---

In Re Ft. Lauderdale Bridge Club, Inc.

---

SAMUEL D. ROSEN,

Appellant,

v.

THOMAS L. ABRAMS,

Appellee.

---

ON CONSOLIDATED APPEALS FROM ORDERS OF THE U.S. BANKRUPTCY COURT
OF THE SOUTHERN DISTRICT OF FLORIDA

---

**AFFIDAVIT OF APPELLANT, SAMUEL D. ROSEN**

---

1

## AFFIDAVIT OF APPELLANT, SAMUEL D. ROSEN

SAMUEL D. ROSEN, Appellant herein, makes this Affidavit in connection with his Reply Brief to Abrams' Consolidated Answer Brief (Doc. 44) in the 23437 Appeal, and for all other motions and purposes to which the facts presented herein are pertinent.

1. The charges against Abrams of serious misconduct are:

   A. Filing the bankruptcy petition herein [D.E. 1] for improper purposes and contrary to his client, the Debtor's, own bests interests, all in violation of the statute. *See*, e.g., *Wortley v. Chrispus Venture Capital, LLC (In re Global Energies, LLC),* 763 F.3d 1341 (11th Cir. Fla. 2014); *In re Nica Holdings, Inc.* (11th Cir., No. 14–14685).

   B. Deceiving Debtor's President into signing a retainer agreement which included a forfeiture provision, i.e., that the $30,000 retainer payment was "fully earned when paid", in violation of Fla. Bar Rule 4-1.5(e). *See* Exhibit 1 hereto.

   C. Filing a fraudulent bankruptcy petition [D.E. 1] which omitted the land and building owned by Debtor valued at $500,000, or 2/3 of the Debtor's total assets. *See* Debtor's tax return for Calendar year 2012, Exhibit 2 hereto.

   D. Filing a required fee disclosure statement [D.E. 2] which omitted the terms of his retainer agreement and claiming he had *not* been paid for post-petition work. Repeating the misconduct in his Final Fee Application filed thereafter [D.E. 76].

   E. Claiming that he expended 20 hours (at $400 per hour) in preparing the Ch. 11 Petition, etc. during the 22-hour period from his retention at about 6:30m on February 25 to the filing of the Ch. 11 Petition at 4:25pm on February 26. *See* [D.E. 2, 76].

F.      In complete disregard of Debtor's interests and without any authorization from the Debtor, agreeing with Judge Ray at the April 16, 2013 hearing that a Ch. 11 Trustee was necessary. *See* Transcript of April 16 hearing [D.E. 69].

G.      Filing a formal motion for the appointment of the Ch. 11 trustee Judge Ray wanted and then recommending to the Office of the U.S. Trustee that Ken Welt, Judge Ray's favorite, intended beneficiary of this plum assignment, be the one appointed.

H.      Suborning the perjury of Kapila when he was nominated for appointment as the accountant for the Trustee Welt.

I.      While still representing the Debtor, filing an *ex parte* motion [D.E. 1340] to reopen the closed bankruptcy to allow him to file a motion for an injunction against his client, Debtor, and its members and former members from suing him for malpractice.

J.      Attaching to his said motion and in violation of Rule 11, Fed. R. Civ. P. and Bankruptcy Rule 9011, a sanctions motion and safe harbor letter he had served on me in 2014 despite that my offending pleading had been timely and promptly withdrawn.

K.      Not disclosing at any time during Judge Isicoff's 22-month tenure on this bankruptcy (from October 2013-August 2015) that he had contributed money to Judge Isicoff's private family charity in at least 2009, in violation of a host of Fla. Bar Rules including Rules 4-3.5(a) and 4-8.4(f), and purposefully concealing that information from me and the other non-contributing attorneys in this bankruptcy. And in like fashion, failing to make such disclosure in any of the six (6) cases in which Abrams was then appearing before Judge Isicoff—in 2009—or in any other case subsequent to 2009.

L.      Willfully and with premeditation, committing an outright fraud on Judge Isicoff in arguing both in his motion papers and at the June 9, 2015 hearing, that he was entitled to

relief both on his motion for breach against Rosen and in his separate motion for an injunction against his own client, the Club and its 1,000-plus members and former members, all on the grounds that *Section 9.6* of the Second Amended Plan [D.E. 1285] provided for a Release of, *inter alia*, all of *Debtor's* claims against Abrams for malpractice et al., and that under *Section 9.8* and *9.9* of said Plan, Abrams was now entitled to an injunction enforcing said release, all without disclosing—and instead purposefully concealing—that *Section 9.7* of the Plan expressly excluded from Section 9.6 any release by Debtor of Abrams pursuant to the specific provisions of the Fla. Bar Rules regulating this subject.

    M. Continuing even to this date to appear as counsel for Debtor in the Bankruptcy Court (*see* current Bankruptcy Court Docket sheet), and to argue to this Court in, *inter alia*, his Consolidated Answer Brief herein, the supposed interests of the Debtor, all without authority to do so from the Debtor and despite having sued the Debtor for an injunction.

    N. Repeatedly refusing to extend any professional courtesy to the attorneys for me, in violation of both the Fla. Bar Rules and Local Rules of this Court.

    O. Violating the civil and perhaps criminal provisions of the Fla. Statutes Ch. 865.09 respecting the use of fictitious names, violating Fla. Bar Rule 4-7.21(f), and violating the Rules of the Courts, all by appearing regularly for the past 13 years and continuing, including here, in the guise of a non-existent law firm, "Gamberg & Abrams". *See* motion filed in the Circuit Court in the 15-14801 appeal re same (*See* filings made on January 11, 13).

    P. Repeatedly, both alone and in concert with his new counsel, Mr. Crockett ("Crockett") engaging in a long, pervasive pattern, continuing to this day, of willful disregard of his duty of candor to the courts, both in outright false representations, in representations that are

4

false and misleading by inference and innuendo, and by silence and concealment of information that he was obliged to disclose.

2.      In support, first, here is a chronology of the pertinent background dates and events:

A.      **2006**:

Following my retirement from the practice of law, I began writing a book on the application of mathematical principles to the game of duplicate bridge. Having prepared a draft, I needed a bridge club with the attributes necessary to conduct beta testing of my theories. The only one in this area that satisfied the necessary conditions was the Ft. Lauderdale Bridge Club, a not-for-profit membership club. I joined the Club and commenced commuting to it from my home in Bal Harbour—a round trip of 1 hour, 40 minutes—five days a week or more.

B.      **February 2010**:

I am expelled by the Bridge Club in a kangaroo proceeding.

C.      **May 2010**:

I filed suit in the Broward Circuit Court against the Bridge Club and its responsible Officers and Board Members[1], alleging principal claims of breach of contract and violation of the procedural due process rights secured to members of a not-for-profit pursuant to Fla. Stat. Ch. 617.0607. The Bridge Club's insurance carrier provides a defense and would indemnify the Club and its representatives-defendants.

---

[1] The Board of Governors of the Bridge Club is, per the Articles of Incorporation, the By-Laws, and the Florida not-for-profit statute (Fla. Stat., Chapter 617) the governing body which possesses all of the power and authority, the four Officers, elected members of the Board, possessing very limited powers.

     D.    **November 2010**:

The Broward Court grants my motion for partial summary judgment of liability against the Club, orders my immediate reinstatement, and reserves for a jury trial my damages claim.[2]

     E.    **June 2011**:

Following the requisite 90-day notice per Ch. 617.07401, I filed a derivative action in the Broward Circuit Court in the name of and for the exclusive benefit of the Bridge Club against certain of its Officers for, e.g., theft of Club funds. Once again, the Club's insurance carrier provided a defense and will indemnify.[3]

     F.    **March 2012**:

I sent another 90-day letter to the Club re more claims of theft and other misconduct by certain representatives of the Club, including the four Officers. Because the Club's insurer had refused to renew its annual policy for 2012, the target Board Members of the Club passed a resolution that if sued, *the Bridge Club* must pay for their defense and indemnify them from any judgment.[4]

     G.    **June 2012**:

I filed, in the Broward Court, a new derivative lawsuit in the name of and for the exclusive benefit of the Club against certain of its representatives. Pursuant to the March resolution, the defendants hire the law firm of Polenberg Cooper to defend them and two of the defendants—the

---

[2] The damages claim had not been tried as of February 26, 2013, the date the Bridge Club filed a Ch. 11 Petition.

[3] In January, 2013, the Broward Court granted my summary judgment on the first two counts of my Complaint and there being no damages sought, entered final judgment on those counts.

[4] The preposterous circular nature and illegality of this is indisputable. *See*, e.g., FL. Bus. Laws Annotated (Cohn, Ames 2011-2012) at Author Commentary to § 607.0850 (at p. 124).

President and Treasurer—tell Polenberg that the Club will pay his outrageous bills and actually do so without any knowledge or approval of the amounts by the members of the Board of Governors.[5] In this proceeding, Polenberg submits knowingly false "expert reports" in support of a motion to dismiss. The Court places the matter on its trial calendar for March, 2013 for an evidentiary hearing, including my request for sanctions against the culpable Polenberg attorneys, including senior partner Polenberg.

      3.     Next, here is a chronology of the litany of Abrams' misconduct: and the context in which it occurred, respecting the filing of the Bankruptcy Petition and thereafter.

      A.     **Wednesday, February 20, 2013**:

The Club's four newly elected Board Members request a status meeting with the attorneys handling all three cases. The meeting is held that evening and present are a representative of the carrier-appointed counsel defending the 2010 and 2011 suits and Jude Cooper, a senior name partner of the firm defending the 2012 suit. At the meeting, the question of filing a bankruptcy petition is raised and Cooper recommends that they talk to a bankruptcy attorney he knows.

      B.     **Friday, February 22, 2013**:

That evening, the Board Members meet again, this time with Cooper's recommended bankruptcy counsel, Thomas Abrams, who discusses a bankruptcy filing. The Board members decide to think about it.

      C.     **Monday morning, February 25, 2013**:

The Broward Circuit hears Cooper's motion to quash my notices for depositions of Polenberg and his associate noticed for Wednesday morning, February 27. Based upon a showing

---

[5] As of the Chapter 11 filing on February 26, Polenberg had run up almost $100,000 in defense costs.

of serious misconduct by the Polenberg firm, including the aforesaid falsified expert reports filed with the Court, the Court denies the motion to quash or limit the scope of inquiry and Orders the Polenberg attorneys to appear for deposition, as noticed, on February 27 with *no restrictions* on the scope of the questions to be posed and answered at the depositions.

      D.      **Monday evening, February 25, 2013**:

The Board holds a meeting starting at 6:00pm and it lasts for thirteen minutes, at which it passed a motion by the votes of the very *defendants* in the 2012 suit, to retain Abrams, for him to "immediately" file a bankruptcy petition, and to pay him a retainer fee of $30,000. The Board Members then go home.

      E.      **Monday evening, February 25, 2013**:

Sometime after 6:30pm, Abrams meets with the Club's President, Bozek, receives the $30,000 retainer check, and has the unwitting Bozek sign a retainer agreement under which the $30,000 is "fully earned when paid", in blatant violation of Rule 4-1.5(e) of the Florida Bar Rules. Abrams then proceeds working around the clock, alone with no help, to prepare and file the Ch. 11 Petition less than 22 hours later, at 4:30pm, February 26 (*see* [D.E. 1]) and with it, his requisite Statement of Compensation [D.E. 2] claiming he spent $8,000 to prepare the Petition—20 hours at his $400 per hour rate—without disclosing his retainer agreement and its offensive language.[6] Further, despite the Club's Articles of Incorporation, its By-Laws, and the explicit limitations of Fla Stat. 617, Abrams files the Petition without even advising, much less obtaining the approval of the members; they are first notified of the Bankruptcy filing the next day, February 27. Abrams' rushed to file the Bankruptcy Petition "immediately" solely to aid the Polenberg firm.

---

[6] In his subsequent Final Fee Application filed in May, 2013 [D.E. 76], Abrams also does not disclose his retainer agreement and instead claims he is owed and has not been paid $30,000 for work done, post-filing, at his $400 per hour rate.

F.   **February 27, 2013 at 8:30a.m.**:

Polenberg's office telephones the court reporter to inform that they will not be appearing for depositions because of the filing of the Bankruptcy Petition and the automatic stay under the Bankruptcy Act. As of that time, no one else is aware of the bankruptcy filing, not the Club's members, not me—and Abrams had never even asked the amount of my claim, either gross or net of the carrier's indemnification, against the Bridge Club. Had he asked, as he finally did two (2) months later, I would have informed that net of the carrier's acknowledged obligation to indemnify *once* a Judgment is issued against the insureds, my entire claim against the Club was less than half of its cash assets.

G.   **Early March, 2013**:

Abrams attends a meeting with me and my counsel and, pursuant to prior request, brings with him and provides a copy of the Bridge Club's tax return—filed February 17, 2013, 9 days before the bankruptcy filing—for calendar year 2012. After noting that the Ch. 11 Petition claims "none" in the Schedule requiring listing of all of Debtor's real estate holdings, and noting that the return not only lists land and a building valued at year-end at $500,000, but claims a depreciation deduction for same, I ask Abrams to correct the false Schedule which omits fully 2/3 of the Debtor's assets, it having $250,000 in cash plus other very modest assets, and no liabilities. Abrams does not.[7]

---

[7] In a subsequent filing with the District Court, Abrams offers his "defense" to this outright fraud, i.e., that it was not his job to correct the Schedules he filed, that the Ch. 11 Trustee, appointed (on an April 19 motion by Abrams) almost three months after the false filing, should have done so (*See* (Doc. 36) at ¶ 10). More recently, Abrams and his new counsel, Crockett, fabricated yet another, equally false "defense" to this misconduct. In their Answer Brief filed with this Court in the 22380 appeal (Doc. 67), they offer the clever wordsmithing and false inference that at the precise time of the filing of the bankruptcy petition on February 26, 2013, *the record did not show any evidence of real estate owned by the Club at that time* (Doc. 67). Since the tax return for 2012 spoke only as of December 31, 2012, that statement was intended to deceive the Court via the

  H.  **Post-filing Discovery**:

I depose each of the four Officers who voted, on February 25, for filing the February 26 Ch. 11 petition. Each testifies that the sole reason for filing it was to "stop the bleeding", "stop the drain on the Club's cash", in paying Polenberg to defend the 2012 suit. In the end, while I had *no net claim* against the Club from the 2010 suit[8], and despite that the 2011 and 2012 suits were *not against* the Club, but were brought for its exclusive benefit, the bankruptcy petition was filed not to protect the Club, *not* to stop litigation *against* the Club, but to stop the litigation *on behalf of the Club* against the Club's representatives who hired Abrams to bail them out (and to protect the Polenberg firm).

  4.  Here is a chronology of Abrams' further misconduct in the Bankruptcy proceeding:

  A.  **April 2013**:

After two (2) months, I was finally able to convince Abrams that we ought submit to a mediation with the insurance carrier (who had agreed to one pre-bankruptcy) to quantify—and settle—the total amount of Rosen's claim, both gross and net of the amount the carrier would pay in indemnification. With the express approval of the Club's Board of Governors, as required for

---

inference and innuendo that sometime between December 31, 2012 and February 26, 2013, the Club had sold its interest in the land and building. Moreover, that statement of no ownership of real estate as of the filing date is blatantly false, as shown by Abrams' own conduct; on April 4, 2013, he filed a motion for the Bankruptcy Court to approve assumption of the ground lease from the City of Ft. Lauderdale to the Club for a small parcel of land upon which the Club had built its building [D.E. 21]. And as the ground lease attached to that motion shows, the City acknowledged that the building was and is owned by the Club and will continue to be so for the full term of the lease—until 2040. In short, the Abrams/Crockett representation in their Answer Brief is not only outstandingly deceptive, but is, in fact, totally false.

[8] Because the insurance policy provided for indemnification of the claims only after a judgment is entered, Rosen was obliged to file a claim in the bankruptcy case.

virtually every decision per the Articles of Incorporation and the By-Laws, on April 2, 2013, Abrams filed a motion to lift the stay so that the mediation with the Club, its insurer, and me, could proceed [D.E. 19]. I, of course, agreed. Thus, on April 16, the agreed motion came before Judge Ray who *denied* it on the grounds that it appeared to him that what this case—with its $250,000 cash pile—needed was the appointment of a Ch. 11 Trustee, and preferably Ken Welt, Judge Ray's personal friend and golfing partner and the principal client and financial benefactor of Judge Ray's son, attorney David Ray.[9] Despite that there were no grounds at all to appoint a Ch. 11 Trustee under the Statute—*see* 11 U.S.C. § 1104(a)—and the Club had been operating business as usual without missing a single session since the bankruptcy filing—Abrams, with zero authority from the Club, responded on the record to Judge Ray's suggestion by *agreeing* with the idea of a Ch. 11 Trustee knowing full well the extraordinary costs of same which would befall the Club.,[10] all to satiate Judge Ray's desire for this plum bankruptcy to be a gift to Welt. Thus, having already committed, on the record, on April 16, to the appointment of a Ch. 11 Trustee, on April 19, Abrams filed a formal motion [D.E. 50] which, as he well knew, was on its face totally insufficient under the statute (but which Judge Ray, for his own ulterior purposes, would approve) and under case law. *See*, e.g., Chief Bankruptcy Judge Hyman's seminal opinion in *In re Sun Cruz Casinos, LLC*, 298 B.R. 821 (Bankr. S.D. Fla., 2003.

---

[9] *See* my subsequent motion to disqualify Judge Ray [D.E. 261, 271, 278, 279, 304], a motion Judge Ray granted, albeit on fabricated, benign grounds [D.E. 318].

[10] For the period of little more than 2 months of the Welt regime—from his appointment by Judge Ray until his August 8 resignation in the face of my motion to remove him for perjury and financial misconduct [D.E. 180]--Welt and his entourage filed fee applications totaling $100,000. After Welt's removal, Abrams, then fully realizing the damages to the Debtor for his sellout of his client to Judge Ray's desires, implored me to join with him to stop the U.S. Trustee's Office from appointing a "successor trustee", but that effort was unsuccessful and thus, a new trustee was appointed whose fees and those of his entourage totaled, in gross, over $1.5 million [D.E. 1285].

B.     **May 2013**:

With Abrams' improper motion for the appointment of a Ch. 11 trustee about to be granted, the Miami Office of the U.S. Trustee solicited recommendations from only Abrams and my then-counsel, for who it should appoint as the Ch. 11 Trustee. My counsel, Pugatch, responded first, saying that we wanted an attorney and recommending Les Osborne. Abrams, ever the slave to Judge Ray's wishes, no matter how inappropriate, how unethical, rejected that proposal and instead recommended who else? Welt![11] Remarkably, despite that one party wanted A and one party wanted B as the Ch. 11 Trustee, the Office of the U.S. Trustee did *not* select a third party, C, but rather appointed Welt. This appointment was then approved by Judge Ray [D.E. 67] despite Welt's blatant perjury in attaining that appointment (*see* [D.E. 180]).

C.     On **May 22**, Welt, as the Ch. 11 Trustee, moved Judge Ray to appoint *Kapila* as the accountant for the trustee [D.E. 73]. That motion was supported by Kapila's Affidavit swearing that he had "no connections" with any of the parties in this bankruptcy case or their counsel. Abrams knew that was outright perjury, having consulted Kapila as an expert witness in this very case (*see also*, Abrams' time sheets confirming his communications with Kapila, attached to [D.E. 76]). And yet, Abrams stood mute, saying not a word to the Court that Kapila's Affidavit was perjury. Even when the motions for Kapila's appointment came to a hearing before Judge Ray, Abrams stood mute, thus suborning Kapila's perjury.

D.     **June 2013**:

When Abrams' "Final" Fee Application came on for hearing before Judge Ray, Abrams still had not and did not there disclose that he had received the $30,000 pursuant to his improper

---

[11] As shown in his e-mail (Exhibit 3 hereto), Abrams nominated as a back-up, Kapila, but disclosed the conflicts issue there arising from Abrams' prior consultations with Kapila as an expert witness for him and the Debtor.

"fully earned when paid" retainer. Thus, Judge Ray granted Abrams' motion [D.E. 133] but cautioned Abrams that if I was successful in my pending motion to dismiss the Ch. 11 filing, Abrams would be entitled to nothing—*zero*. *See* Transcript of hearing [D.E. 144]. As a result, Abrams was in a quandary. He had already received and "earned" $30,000, all but $8,000 of which was for post-petition services (*see* [D.E. 2]), but Judge Ray did not know this and the situation was quite problematic given the Court's comments at the hearing. Abrams' solution—one day after the July 2 Order granting his Final fee app., Abrams filed a motion for *permission* to draw down on the retainer he held [D.E. 126]. And that motion suggested that Abrams was holding this retainer amount separately (e.g., in an attorney's trust account) rather than already in his pocket. Although on this motion, Abrams was obliged to—and finally did—attach his retainer agreement, he never provided notice to the Court of the "fully earned when paid" provision, nor that the funds were not being held in a trust account. Indeed, the very thrust of the motion—to "draw-down on" the Retainer funds—was intended to continue to conceal what had already occurred. The Court granted Abrams' motion [D.E. 153], allowing him to draw down on the money he had already drawn down on February 25.

E.   **October 2013**:

After a transfer and brief stay before Judge Olson, the bankruptcy case was transferred to Judge Isicoff. Unbeknownst to me at that time, Judge Isicoff, throughout her entire tenure on the bench and continuing, was operating a private, Isicoff family charity, and targeting, soliciting and accepting contributions from the very attorneys who appear before her. Exhibit 4 hereto is a partial list of donors—only for donations made in 2009, 2010 and 2013—which was attained from the

internet post-the June 2015 proceedings.[12] And Exhibit 5 hereto is a chart showing the attorneys/law firms contributing in just those three (3) years which are engaged in bankruptcy practice. It is immediately apparent that this chart is a "Who's Who" of the local bankruptcy bar. Abrams, d/b/a "Gamberg & Abrams", is on the list and Judge Isicoff even solicited and accepted a contribution from her own Judicial Assistant.

      F.    Judge Isicoff's conduct blatantly violates the Code of Judicial Conduct for United States Judges (*see* Canon 4(C) and (D)(4) and the list of prohibited conduct appearing in 11th Cir. JCDR). Indeed, it borders on violations of Title 18 as, perhaps, outright bribes.

      G.    Moreover, given Abrams' admission of at least one contribution in 2009, he apparently, similarly, made no disclosure of same to the other non-contributing attorneys and parties in the six cases he had pending before Judge Isicoff at the time:

*In re Purity Products, Inc.* (Bankr. Ct. No. 04-12265-LMI);

*In re Miranda Lovett* (Bankr. Ct. No. 07-14816-LMI);

*In re Manuel Eduardo Cabeza* (Bankr. Ct. No. 07-20624-LMI)(case terminated 5/22/09);

*In re Latin America Modia Management, LLC* (Bankr. Ct. No. 08-13990-LMI)(case terminated 4/24/09);

*In re Rene Piedra DMD and Associates* (Bankr. Ct. No. 08-17533-LMI)(case still open); and

*In re New Florida Steel, Inc.* (Bankr. Ct. No. 08-28307-LMI)(case terminated 7/13/11).

---

[12] Although the Isicoff family charity's tax returns show significant contributions made in other years, the lists of donors has disappeared from the internet and Judge Isicoff's husband, Steven, the President of the family charity, declined Rosen's written request for disclosure of all donors [D.E. 1406].

H.   **March 2014**:

On March 24, I filed a motion to disqualify Judge Isicoff, a motion supported by an Affidavit and exhibits totaling over 250 pages [D.E. 930, 933, 939]. On March 28, Judge Isicoff denied the motion and accused me of nothing short of outright perjury, by holding that certain unidentified portions of my Affidavit were false [D.E. 942]. I immediately appealed.[13]

I.   **April 16, 2014**:

The events of April 16, starting with me suffering a cardiac event, Judge Isicoff's *sua sponte* Injunction Order entered against me as I lay in the hospital's Coronary Care Unit, etc., are set forth in my subsequent filing in the Bankruptcy Court [D.E. 1415]. Suffice to say that as a result of the extraordinary duress and coercion I was under at the time and faced with no hope of getting away from Judge Isicoff, I succumbed to a settlement of my claims in bankruptcy (and my claims against the insurance carrier), settling for six cents on the dollar. The subsequent writing setting forth all of the overreaching terms of the settlement was then presented and approved by Judge Isicoff. That settlement—known as the "Rosen Settlement"—appears in full at [D.E.1089]. Critically, as I have previously told the Court, with my return to health, the single most significant impetus to my proceeding to sign the Rosen Settlement was to get away from a judge who I considered to be thoroughly biased and lacking in judicial temperament. Thus, throughout the Rosen Settlement, my desire to never appear before Judge Isicoff again was repeatedly stated. Had Judge Isicoff recused herself in March, 2014, **or** had she or Abrams made disclosure of their

---

[13] The appeal was assigned to Judge Moore, as was the related follow-up appeal. On July 2, 2014, Judge Moore issued an Order to Show Cause directing that I and my counsel disclose all of the evidence in support of their position for disqualification of Judge Isicoff (as if the 20-plus pages of the March 24 motion did not exist), coupled with a threat of sanctions.

financial dealings, I would not have signed the Rosen Settlement, but rather, would have moved for disqualification, a motion that as a matter of law had to be granted.

J.    **July 2014 – May 2015**:

Under the terms of the Rosen Settlement (at ¶ 10), I was barred from any further participation in the bankruptcy proceeding, had no right or obligation to file anything, and, indeed, was stricken from the service list, receiving nothing thereafter (except for a ballot re the proposed Plan obviously sent to me in error), including the Second Amended Plan [D.E. 1285].

K.    On April 7, 2015, I wrote a letter to the Bridge Club on behalf of myself and other past and current members, urging it to sue Abrams for malpractice. The original handwritten letter, plus a subsequent typed version, together with Abrams' April 15 response and my May 6 reply, are all Exhibits to [D.E. 1391]. Notably, my May 6 letter raised the very question of whether the Bridge Club had released Abrams from claims it had against him for malpractice, conceding there that if so, if the Club could not sue him, *a priori*, a derivative action against him under 617.07401 could not possibly lie. Abrams chose to not even respond to that letter.

L.    **May 20, 2015**:

Ignoring my May 6 letter, Abrams filed an *ex parte* motion [D.E. 1340] to reopen the bankruptcy for the purpose of filing two motions—one against me for breach of the Release provisions of *Section 7.2* of the Rosen Settlement by writing the April 7 letter, the second a motion against his client, the Bridge Club, for an injunction barring it from suing him for malpractice pursuant to the Release provisions of *Section 9.6* of the Second Amended Plan and the provisions for enforcement, *Section 9.8* and *Section 9.9*.[14]  And, in direct violation of Rule 11, Fed. R. Civ.

---

[14] The statute, 11 U.S.C. § 350, while broad in its language, provides for reopening primarily for the *benefit* of the Debtor, e.g., to administer additional assets of the Debtor. Yet Abrams filed to reopen to assert his claim for relief *against* the Debtor.

P. and Bankruptcy Rule 9011, Abrams attached to his motion his 2014 motion against me and his safe harbor letter despite that the allegedly offending pleading had been fully and promptly withdrawn, thus barring Abrams disclosure of this letter and motion to the Court. Two days later, Judge Isicoff granted the motion, not even waiting for me to receive it via mail, or to respond [D.E. 1342]. Abrams then proceeded to file the two motions [D.E. 1343, 1344]. Critically, both in his two motions and at the June 9 oral argument, Abrams specifically argued, and the Court relied upon, his Section 9.6 of the Plan.

M.   **The June 9 Hearing**:

In the first part of the June 9 hearing before Judge Isicoff, she heard Abrams' motion for breach against me. Abrams there argued—just as in his papers [D.E. 1343]—that my April 7 letter violated both *Section 7.2* of the Rosen Settlement and *Section 9.6* of the Second Amended Plan, despite that I was not a party to it and, pursuant to paragraph 10 of the Rosen Settlement, had never even received it and, as explicitly provided, I was *not* bound by any proceeding in the bankruptcy following my settlement. Judge Isicoff agreed with Abrams, finding me both in breach of the Rosen Settlement and adding "moreover" my violation of the Second Amended Plan, and awarded Abrams attorney's fees pursuant to the fee shifting provisions of *Section 17* of the Rosen Settlement, directed Abrams to submit his statement of fees claimed and if I objected, an evidentiary hearing would be held to determine the amount. *See* Transcript of June 9 Hearing, [D.E. 1374]. Judge Isicoff then memorialized her oral ruling in a written Order [D.E. 1351]. As the Court then reached Abrams' second motion, I requested and was granted permission to leave upon the earlier representations by Abrams—including on the record earlier in that same June 9 hearing—that I was not involved in the motion for relief against the Bridge Club and, indeed, even

lacked standing to be heard on it.[15] Judge Isicoff agreed, Abrams said nothing, and the Court proceeded to hear Abrams' second motion after I left. Then, Abrams, as in his motion papers, argued the Release of the Club's claims against him in *Section 9.6* of the Second Amended Plan, and as for the request for an injunction against the Club's 1000-plus members and former members, Abrams admitted he had not provided them any notice of his requested injunction. The Court appeared to orally grant part of the motion conditionally and directed Abrams to submit a proposed Order. The Order Abrams then wrote and submitted—and which Judge Isicoff signed as is [D.E. 1350]—is both inconsistent with the Court's oral rulings and includes an injunction against the 1000-plus current and former members of the Bridge Club which, by definition, includes Ezrin and me.

      N.      **Post-June 9 Events**:

I commissioned an investigation, served my Opposition to Abrams' Fee Statement together with a request that the promised hearing on it be expedited [D.E. 1365], served discovery demands on Abrams (who promptly moved to quash [D.E. 1367]), and filed an Affidavit setting forth what I had discovered, including Judge Isicoff's solicitation and request for contributions to her private family charity targeting attorneys appearing before her, including Abrams. Judge Isicoff then issued an Order [D.E. 1371] reversing herself, denying me the promised evidentiary hearing on Abrams' fee claims, appointing himself as an expert witness for Abrams, and then granted Abrams' fee claim in full, on the grounds that based upon *her* 31 years of experience, she could decide it without hearing from me.

---

[15] With his typical lack of candor, Abrams has told this Court in his Answer Brief in the 22380 appeal, that I "waived" my right to object/appeal the ensuing Injunction Order because I had left the courtroom and did not participate on the argument of it (Doc. 67), despite that earlier in that hearing it was Abrams who asserted that I was not involved in that second motion and, indeed, even lacked standing to oppose it. *See* [D.E. 1374 at p. 22].

O.     **Abrams' Lies Are Exposed**:

As a result of my post-June 9 investigation, I also discovered that while Abrams had throughout the proceedings appeared as "Gamberg & Abrams, by Thomas Abrams, Attorneys for Thomas Abrams". "Gamberg & Abrams" was a fictitious name registration and it appeared that the "Gamberg & Abrams" law firm does not and never has existed. *See* my pending motion, dated January 11, 2016, in the 11th Circuit to strike all filings made in the 14801 appeal as "Gamberg & Abrams", Abrams' Opposition of January 13 containing critical admissions, and my subsequent Reply.

P.     In addition, after finally obtaining a copy of the Second Amended Plan, I discovered that while *Section 9.6* is indeed a broad release and exculpation clause and would appear to include a release by the Bridge Club of claims against Abrams, the following section— *Section 9.7*—which Abrams purposefully withheld and concealed both in his papers and at the June 9 argument, totally refutes that. It provides that notwithstanding anything contained in *Section 9.6*, there is **NO RELEASE** of any claims by the Debtor against its counsel, Abrams, an exclusion required by the Florida Bar Rule actually cited in that *Section 9.7*.[16] Abrams' omission/concealment of *Section 9.7* was absolutely premeditated. First, Abrams was a co-author and co-sponsor of the Plan. He helped draft it, signed it and presented it for approval. Thus, he cannot claim ignorance of *Section 9.7*. Further, while Abrams physically attached a copy of the Rosen Settlement to his motion against me alleging breach—for the Court's convenience—he did

---

[16] Although my subsequent Court filings have repeatedly stressed this *pernicious* fraud upon the Bankruptcy Court by Abrams, his only "defense" has been that when I discovered this fraud, *he* should have filed a motion for reconsideration before Judge Isicoff, as if it was *my duty* to correct his fraud rather than his. *See* (Doc. 35) in the 22380 appeal, at p. 10, fn. 7.

*not* attach a copy of the Plan to his motion for an injunction. *Compare* [D.E. 1343 and 1344]. Thus, the evidence of Abrams' premeditation is compelling.

Q.    I duly filed notices of appeals from all three (3) of Judge Isicoff's Orders and they have been consolidated before Judge Moore in the 22380 appeal.

R.    **August 14, 2015**:

As I was starting to prepare a motion to disqualify Judge Isicoff based, *inter alia*, on her misconduct respecting her private family charity, Judge Isicoff, *sua sponte*, issued an Order of Recusal which provided <u>no</u> grounds for same [D.E. 1394].

S.    Respecting Abrams' long and pernicious repudiation of his duty of candor to the Court—*see* Fla Bar Rule 4-3.3—one need look no further than his opening brief in the 22380 appeal (Doc. 67), the many economies with the truth therein are fully documented in my stricken Reply Brief dated December 23, copy attached hereto as Exhibit 6 for ready reference. Indeed, the Court will note that in his Answer Brief there, Abrams argued that he is entitled to attorney's fees despite admittedly appearing *pro se*, under Florida law which does not follow federal law as expressed in *Kay v. Ehrler,* 499 U.S. 432 (1991) and its progeny. However, as shown in my Reply Brief, Abrams purposely concealed that all of the Florida State Court cases he cited pre-dated *Kay* and, as he well knows, subsequent to *Kay*, both the Florida state courts and federal courts sitting as *Erie* courts applying Florida law, completely disagree with him. *See* Reply Brief, Exhibit 6, and the final entry in Volume II of my Appendix, attached as Exhibit 7 hereto.

T.    In addition, just in his Consolidated Answer Brief here at bar, Abrams takes a smorgasbord of extreme liberties with the truth and repeatedly offers, as fact, statements that are not only untrue, but are *dehors* the record. *See* Chart, Exhibit 8 hereto. See also Rosen's January 18 Affidavit submitted to this Court in his 23437 appeal.

U. In short, Abrams is a recidivist, an advocate committed to eschewing his professional and ethical duty of candor in favor of irresponsible, willfully false assertions and endless citations of irrelevant, meaningless cases which are designed solely to distract this Court. His misconduct is, both qualitatively and quantitatively far, far more serious, more offensive, more unethical than either the attorney in *Global Energies* or the attorney in *P.G. Oil v. Motiva Enters.*, 397 F. Supp. 2d 1359 (S.D. Fla, 2005) which this Court held was sufficient for disbarment. And that is exactly what ought happen to Abrams here.

FURTHER, AFFIANT SAYETH NAUGHT.

Dated 16 February, 2016

**Samuel D. Rosen**
10175 Collins Avenue, Apt. 502
Bal Harbour, FL 33154
Telephone No.: (305) 868-6096
Cellular No.: (917) 974-7588

State of Florida )
                 ) ss:
County of Broward )

Subscribed and sworn to before me this 16th day of February, 20 16, by SAMUEL D. ROSEN, who is personally known to me or has produced _____ as identification.

_____
(Signature of Notary Public)

ANDREW L. JIMENEZ
MY COMMISSION # FF192091
EXPIRES: January 22, 2019

19

# EXHIBIT
# 1

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### Fort Lauderdale Division
www.flsb.uscourts.gov

In re:                                                      **Chapter 11**

**THE FORT LAUDERDALE**                          **Case No. 13-14289-RBR**
**BRIDGE CLUB, INC.**

      Debtor.
_____/

## GAMBERG & ABRAMS MOTION TO APPLY PREPETITION RETAINER

Gamberg & Abrams, pursuant to this Court's July 2, 2013 Order (D.E. 133) and all other applicable law, files this its motion to apply pre-petition retainer to pay down the fees awarded to it by this court and states:

1.      On February 26, 2013 (the "Petition Date"), Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Gamberg & Abrams was approved by this Court to represent the Debtor In Possession. (D.E. 24).

2.      As disclosed in the bankruptcy filings (D.E.2), Gamberg & Abrams is holding a remaining pre-petition retainer in the amount of $21,354.00.

3.      On July 2, 2013 this Court entered an Order Granting Gamberg & Abrams Final Application for Allowance of Compensation and Reimbursement of Expenses, As Counsel for the Debtor In Possession(D.E. 133) awarding fees in the amount of $38,640.00. The Chapter 11 Trustee consented to the relief and the only objecting party ultimately withdrew his objection.

4.      The Order provided that Gamberg & Abrams may seek an Order allowing drawdown of its pre-petition retainer by the filing of a separate motion seeking such authority.

5.      Gamberg & Abrams undertook the representation in reliance on the pre-petition retainer and its ability to apply same in the event the court ultimately awarded its fees. A true and correct copy of the pre-petition retainer agreement is attached hereto as Exhibit "A".

6.     The Chapter 11 Trustee has no objection to the relief sought in this Motion.

**WHEREFORE**, the Debtor respectfully requests the Court to enter an order granting Debtor's Motion allowing the application/drawdown of the $21,354.00 remaining pre-petition retainer to pay the Awarded Attorneys Fees and such other and further relief this court deems just and proper.

Dated: _____, 2013.

Respectfully submitted,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court of the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

GAMBERG & ABRAMS
*Attorneys for Debtor*
1776 North Pine Island Road, Suite 309
Fort Lauderdale, Florida 33322
Telephone:     (954) 523-0900
Facsimile:     (954) 915-9016
E-mail:     tabrams@tabramslaw.com

By: /s/ Thomas L. Abrams
     Thomas L. Abrams, Esquire
     Florida Bar No. 764329

2



# GAMBERG & ABRAMS

### ATTORNEYS AT LAW

February 25, 2013

The Fort Lauderdale Bridge Club, Inc.
700 N.E. Sixth Terrace
Ft. Lauderdale, FL 33304

**Re:** **The Fort Lauderdale Bridge Club, Inc./Representation in Chapter 11 Bankruptcy Proceedings**

Dear Sir or Madam:

The Fort Lauderdale Bridge Club, Inc., hereinafter "Client", hereby retains and employs Gamberg & Abrams, hereinafter "Attorney", as its attorney to represent it as Counsel in Chapter 11 proceedings.

It is understood by the Client that the Attorney shall file a Chapter 11 petition, Statement of Financial Affairs, all related schedules, Chapter 11 Plan of Reorganization and Disclosure Statement, and other required documents in the United States Bankruptcy Court for the Southern District of Florida based upon full disclosure of all relevant items by the Client, and shall perform the following services as they relate to the instant bankruptcy cases:

1. Prepare, on behalf of the debtor, all necessary petitions, schedules, amendments, applications, motions, reports and other legal papers;

2. Advise and counsel the debtor concerning the operation of its business in compliance with Chapter 11 and Orders of the Bankruptcy Court;

3. Prosecute and defend any causes of action on behalf of debtor in Bankruptcy Court to the extent said actions are deemed necessary and/or appropriate to pursue in said Court and related to these proceedings;

4. Assist in the formulation of a plan of reorganization and the preparation of a disclosure statement; and

5. Provide any other legal services as may be requested by Client and agreed upon by Attorney, within the scope of Attorney's expertise.

In addition to the filing of a Chapter 11 petition for Client, the Attorney will file the papers necessary to defend all contested matters including motions for relief from the automatic stay with regard to any and all proceedings on property which is owned by Client. Client, however, agrees to furnish all necessary documentation and appraisals, if necessary, to allow the Attorney to file said papers and defend said actions.



EXHIBIT
"A"

1776 N. Pine Island Road, Suite 309  •  Fort Lauderdale, Florida 33322
Telephone: (954) 523-0900  •  Facsimile: (954) 915-9016

February 25, 2013
Page -2-

The Attorney's services shall also include negotiations with any Trustee, the creditors and all committees, working with and cooperating with the Court and the Office of the U.S. Trustee, whose assistance may or may not be sought in these cases in order to facilitate and resolve the problems with regard to administrative matters.

The Attorney's services will not include responsibility for general corporate representation; securities, admiralty or tax advice; or representation in non-bankruptcy litigation unless specifically agreed separately in writing.

It is further understood by Client, and by all signatories to this Agreement, that the representation to be provided by Attorney is for the benefit of the Clients and not any other party. The advice to be rendered and actions to be undertaken are solely to be in fulfillment of this responsibility. While Attorney may be dealing with the principals or representatives of Client in fulfilling his responsibilities, he is not representing these principals or representatives in their individual or any other capacity.

Attorney agrees to represent Client for an initial fee retainer ("Fee Retainer") for fees of Twenty Seven Thousand and 00/100 ($27,000.00) Dollars, which includes costs of Three Thousand and 00/100 ($3,000.00) Dollars. The representation shall not commence until receipt of the retainer amount. Attorney acknowledges that the full amount has been paid prior to filing the petition. The Fee Retainer is deemed earned when paid. By executing this retainer agreement, Client grants Gamberg & Abrams a security interest in the retainer funds to secure all fees and costs owed by the Client to Gamberg & Abrams. Any additional actual costs incurred by Attorney, will be reimbursed upon periodic submission of bills for costs so incurred. Client further acknowledges that there will be certain direct costs for which Client will be responsible, including certain mailing and printing costs; costs attributable to other professionals and quarterly fees assessed by the Office of the United States Trustee based upon monthly disbursements.

It is further understood and agreed between the parties that the Attorney shall be entitled to seek further compensation in this case for services rendered in excess of the initial retainer. Attorney shall seek such further compensation by filing the appropriate application before the Bankruptcy Court wherein the Bankruptcy Court will review said application based upon the services performed for client. In the event further fees are awarded to Attorney by the Bankruptcy Court,

said fees shall be paid when awarded, and in any event, not later than upon confirmation of any plan of reorganization.

Attorney will seek compensation before the Bankruptcy Court at the following rates:

| | |
|---|---|
| Thomas L. Abrams | $400.00 per hour |
| Jay M. Gamberg | $400.00 per hour |
| Jared L. Gamberg | $300.00 per hour |
| Paralegals | $125.00 per hour |

It is understood by Client that the foregoing retainer may be applied and used as Attorney sees fit, but to the extent required is subject to ultimate approval by the Court upon application. It is further understood

February 25, 2013
Page -3-

by Client that in the ordinary course of Attorneys business, the above hourly rates are periodically adjusted and this retainer agreement will be deemed to be accordingly adjusted.

**Client Cooperation:** Client will be expected to cooperate in all respects during the pre-filing fact investigation period and during the pendency of the Chapter 11 Case. The cooperation includes providing all necessary and pertinent information concerning the nature of the case, existence of defenses to creditor claims, and general communications as to the merits of the reorganization effort. Further, the Client will be responsible for providing and/or preparing the bankruptcy petition and schedules, the financial information necessary to complete the filing, preparation of monthly Debtor-in-Possession reports, and any supplemental financial information or projections which are required to be filed with the plan of reorganization. The Client also agrees to provide technical assistance, either through counsel or internal personnel, as to the nature of the Client's business and the regulatory structure governing such business operations. Along these lines, it may be necessary to retain experts or specialty counsel in the publicly traded securities field and tax field as the undersigned does not specialize in these areas and the Client agreed to identify and retain such experts or counsel, if necessary.

Attorney further reserves the right to withdraw from representations of Client in the event that it is found that the Client had made false disclosures or non-disclosures to Attorney. Client hereby agrees to the payment terms and conditions of this representation.

Very truly yours,
Gamberg & Abrams

Thomas L. Abrams, Esq.

TLA/fc

Accepted and Agreed this __25__ day of __Feb.__, 2013.

THE FORT LAUDERDALE BRIDGE CLUB, INC.

By: _____
    ALLEN A. Bozek
    Print Name

Its: _PRESIDENT_

# EXHIBIT
# 2

Form **990-T**

Department of the Treasury
Internal Revenue Service

**Exempt Organization Business Income Tax Return**
**(and proxy tax under section 6033(e))**
For calendar year 2012 or other tax year beginning _____, 2012, and
ending _____, 20____.   ▶ See separate instructions.

OMB No. 1545-0687

**2012**

Open to Public Inspection for
501(c)(3) Organizations Only

**A** ☐ Check box if
address changed

**B** Exempt under section
☑ 501( C )( 7 )
☐ 408(e)   ☐ 220(e)
☐ 408A    ☐ 530(a)
☐ 529(a)

**C** Book value of all assets
at end of year

Print
or
Type

Name of organization ( ☐ Check box if name changed and see instructions.)
FORT LAUDERDALE BRIDGE CLUB

Number, street, and room or suite no. If a P.O. box, see instructions.
700 NE 6TH TERRACE

City or town, state, and ZIP code
FORT LAUDERDALE, FL 33304

**D** Employer identification number
(Employees' trust, see instructions.)
59-0947504

**E** Unrelated business activity codes
(see instructions)

**F**  Group exemption number (see instructions) ▶

**G**  Check organization type ▶  ☑ 501(c) corporation   ☐ 501(c) trust   ☐ 401(a) trust   ☐ Other trust

**H**  Describe the organization's primary unrelated business activity. ▶

**I**  During the tax year, was the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group?  .  .  ☐ Yes  ☑ No
If "Yes," enter the name and identifying number of the parent corporation. ▶

**J**  The books are in care of ▶ MARK LAFONTAINE, MST          Telephone number ▶  954-495-4565

**Part I   Unrelated Trade or Business Income**

| | | | (A) Income | (B) Expenses | (C) Net |
|---|---|---|---|---|---|
| 1a | Gross receipts or sales | | | | |
| b | Less returns and allowances | c  Balance ▶ | 1c | | |
| 2 | Cost of goods sold (Schedule A, line 7) | | 2 | | |
| 3 | Gross profit. Subtract line 2 from line 1c | | 3 | | |
| 4a | Capital gain net income (attach Schedule D) | | 4a | | |
| b | Net gain (loss) (Form 4797, Part II, line 17) (attach Form 4797) | | 4b | | |
| c | Capital loss deduction for trusts | | 4c | | |
| 5 | Income (loss) from partnerships and S corporations (attach statement) | | 5 | | |
| 6 | Rent income (Schedule C) | | 6 | | |
| 7 | Unrelated debt-financed income (Schedule E) | | 7 | | |
| 8 | Interest, annuities, royalties, and rents from controlled organizations (Schedule F) | | 8 | | |
| 9 | Investment income of a section 501(c)(7), (9), or (17) organization (Schedule G) | | 9 | 4136  00 | 4000  00 | 136  00 |
| 10 | Exploited exempt activity income (Schedule I) | | 10 | | |
| 11 | Advertising income (Schedule J) | | 11 | | |
| 12 | Other income (see instructions; attach statement) | | 12 | | |
| 13 | **Total.** Combine lines 3 through 12 | | 13 | 4136  00 | 4000  00 | 136  00 |

**Part II   Deductions Not Taken Elsewhere** (see instructions for limitations on deductions) (except for contributions, deductions must be directly connected with the unrelated business income)

| | | | |
|---|---|---|---|
| 14 | Compensation of officers, directors, and trustees (Schedule K) | 14 | |
| 15 | Salaries and wages | 15 | |
| 16 | Repairs and maintenance | 16 | |
| 17 | Bad debts | 17 | |
| 18 | Interest (attach statement) | 18 | |
| 19 | Taxes and licenses | 19 | |
| 20 | Charitable contributions (see instructions for limitation rules) | 20 | |
| 21 | Depreciation (attach Form 4562) | 21 | |
| 22 | Less depreciation claimed on Schedule A and elsewhere on return | 22a | 22b |
| 23 | Depletion | 23 | |
| 24 | Contributions to deferred compensation plans | 24 | |
| 25 | Employee benefit programs | 25 | |
| 26 | Excess exempt expenses (Schedule I) | 26 | |
| 27 | Excess readership costs (Schedule J) | 27 | |
| 28 | Other deductions (attach statement) | 28 | |
| 29 | Total deductions. Add lines 14 through 28 | 29 | |
| 30 | Unrelated business taxable income before net operating loss deduction. Subtract line 29 from line 13 | 30 | 00 |
| 31 | Net operating loss deduction (limited to the amount on line 30) | 31 | 00 |
| 32 | Unrelated business taxable income before specific deduction. Subtract line 31 from line 30 | 32 | 136  00 |
| 33 | Specific deduction (generally $1,000, but see line 33 instructions for exceptions) | 33 | 1000  00 |
| 34 | Unrelated business taxable income. Subtract line 33 from line 32. If line 33 is greater than line 32, enter the smaller of zero or line 32 | 34 | 00 |

For Paperwork Reduction Act Notice, see instructions.          Cat. No. 11291J          Form **990-T** (2012)

Form 990-T (2012)

Page **2**

## Part III  Tax Computation

| | | | | |
|---|---|---|---|---|
| 35 | **Organizations taxable as corporations** (see instructions for tax computation). Controlled group members (sections 1561 and 1563) check here ▶ ☐ **See instructions** and: | | | |
| a | Enter your share of the $50,000, $25,000, and $9,925,000 taxable income brackets (in that order): | | | |
| | (1) $ \_\_\_\_\_ (2) $ \_\_\_\_\_ (3) $ \_\_\_\_\_ | | | |
| b | Enter organization's share of: (1) Additional 5% tax (not more than $11,750) | $ | | |
| | (2) Additional 3% tax (not more than $100,000) | $ | | |
| c | Income tax on the amount on line 34 . . . . . . . . . . . ▶ | **35c** | |
| 36 | Trusts taxable at trust rates (see instructions for tax computation). Income tax on the amount on line 34 from: ☐ Tax rate schedule or ☐ Schedule D (Form 1041) . . . . ▶ | **36** | |
| 37 | Proxy tax (see instructions) . . . . . . . . . . . . . . . ▶ | **37** | |
| 38 | Alternative minimum tax . . . . . . . . . . . . . . . . . | **38** | |
| 39 | **Total.** Add lines 37 and 38 to line 35c or 36, whichever applies . . . . . | **39** | |

## Part IV  Tax and Payments

| | | | | |
|---|---|---|---|---|
| 40a | Foreign tax credit (corporations attach Form 1118; trusts attach Form 1116) | 40a | | |
| b | Other credits (see instructions) . . . . . . . . . . | 40b | | |
| c | General business credit. Attach Form 3800 (see instructions) . . | 40c | | |
| d | Credit for prior year minimum tax (attach Form 8801 or 8827) . . | 40d | | |
| e | Total credits. Add lines 40a through 40d . . . . . . . . . . . . | | 40e | |
| 41 | Subtract line 40e from line 39 . . . . . . . . . . . . . . . . | | 41 | |
| 42 | Other taxes. Check if from: ☐ Form 4255 ☐ Form 8611 ☐ Form 8697 ☐ Form 8866 ☐ Other (attach statement) | | 42 | |
| 43 | **Total tax.** Add lines 41 and 42 . . . . . . . . . . . . . . . | | 43 | |
| 44a | Payments: A 2011 overpayment credited to 2012 . . . . . | 44a | | |
| b | 2012 estimated tax payments . . . . . . . . . . | 44b | | |
| c | Tax deposited with Form 8868 . . . . . . . . . | 44c | | |
| d | Foreign organizations: Tax paid or withheld at source (see instructions) | 44d | | |
| e | Backup withholding (see instructions) . . . . . . . | 44e | | |
| f | Credit for small employer health insurance premiums (Attach Form 8941) | 44f | | |
| g | Other credits and payments: ☐ Form 2439 | | | |
| | ☐ Form 4136 ☐ Other Total ▶ | 44g | | |
| 45 | **Total payments.** Add lines 44a through 44g . . . . . . . . . . | | 45 | |
| 46 | Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . ▶ ☐ | | 46 | |
| 47 | **Tax due.** If line 45 is less than the total of lines 43 and 46, enter amount owed . . . . ▶ | | 47 | |
| 48 | **Overpayment.** If line 45 is larger than the total of lines 43 and 46, enter amount overpaid . . ▶ | | 48 | |
| 49 | Enter the amount of line 48 you want: Credited to 2013 estimated tax ▶ \_\_\_\_ Refunded ▶ | | 49 | |

## Part V  Statements Regarding Certain Activities and Other Information (see instructions)

| | | Yes | No |
|---|---|---|---|
| 1 | At any time during the 2012 calendar year, did the organization have an interest in or a signature or other authority over a financial account (bank, securities, or other) in a foreign country? If "Yes," the organization may have to file Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. If "Yes," enter the name of the foreign country here ▶ | | ✓ |
| 2 | During the tax year, did the organization receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," see instructions for other forms the organization may have to file. | | ✓ |
| 3 | Enter the amount of tax-exempt interest received or accrued during the tax year ▶ $ | | |

## Schedule A—Cost of Goods Sold. Enter method of inventory valuation ▶

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | | 6 | Inventory at end of year . . . | 6 | |
| 2 | Purchases . . . . . | 2 | | 7 | Cost of goods sold. Subtract line 6 from line 5. Enter here and in Part I, line 2 . . . . | 7 | |
| 3 | Cost of labor . . . . | 3 | | | | | |
| 4a | Additional section 263A costs (attach statement) | 4a | | 8 | Do the rules of section 263A (with respect to property produced or acquired for resale) apply to the organization? | **Yes** | **No** |
| b | Other costs (attach statement) | 4b | | | | | |
| 5 | **Total.** Add lines 1 through 4b | 5 | | | | | |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**Sign Here**

Signature of officer _Keith Gillman_ | Date 12/17/13 | Title TREASURER

May the IRS discuss this return with the preparer shown below (see instructions)? ☐ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name Mark Lafontaine | Preparer's signature | Date 1/29/13 | Check ☐ if self-employed | PTIN P01293186 |
|---|---|---|---|---|---|
| | Firm's name ▶ LAFONTAINE AND ASSOCIATES, INC. | | | Firm's EIN ▶ 26-4081665 | |
| | Firm's address ▶ 5100 N. FEDERAL HIGHWAY, SUITE 407, FORT LAUDERDALE, FL 33308 | | | Phone no. 954-495-4565 | |

Form **990-T** (2012)

T1 002502

Form 990-T (2012)

Page **3**

## Schedule G—Rent Income (From Real Property and Personal Property Leased With Real Property) (see instructions)

**1. Description of property**

(1)

(2)

(3)

(4)

| | 2. Rent received or accrued | | 3(a) Deductions directly connected with the income in columns 2(a) and 2(b) (attach statement) |
|---|---|---|---|
| | (a) From personal property (if the percentage of rent for personal property is more than 10% but not more than 50%) | (b) From real and personal property (if the percentage of rent for personal property exceeds 50% or if the rent is based on profit or income) | |
| (1) | | | |
| (2) | | | |
| (3) | | | |
| (4) | | | |
| Total | | Total | |

(c) Total income. Add totals of columns 2(a) and 2(b). Enter here and on page 1, Part I, line 6, column (A)  ▶

(b) Total deductions. Enter here and on page 1, Part I, line 6, column (B) ▶

## Schedule E—Unrelated Debt-Financed Income (see instructions)

| | 1. Description of debt-financed property | 2. Gross income from or allocable to debt-financed property | 3. Deductions directly connected with or allocable to debt-financed property | |
|---|---|---|---|---|
| | | | (a) Straight line depreciation (attach statement) | (b) Other deductions (attach statement) |
| (1) | | | | |
| (2) | | | | |
| (3) | | | | |
| (4) | | | | |

| | 4. Amount of average acquisition debt on or allocable to debt-financed property (attach statement) | 5. Average adjusted basis of or allocable to debt-financed property (attach statement) | 6. Column 4 divided by column 5 | 7. Gross income reportable (column 2 x column 6) | 8. Allocable deductions (column 6 x total of columns 3(a) and 3(b)) |
|---|---|---|---|---|---|
| (1) | | | % | | |
| (2) | | | % | | |
| (3) | | | % | | |
| (4) | | | % | | |
| Totals | | | ▶ | Enter here and on page 1, Part I, line 7, column (A). | Enter here and on page 1, Part I, line 7, column (B). |

Total dividends-received deductions included in column 8 . . . . . . . . . . . . . . . ▶

## Schedule F—Interest, Annuities, Royalties, and Rents From Controlled Organizations (see instructions)

**Exempt Controlled Organizations**

| | 1. Name of controlled organization | 2. Employer identification number | 3. Net unrelated income (loss) (see instructions) | 4. Total of specified payments made | 5. Part of column 4 that is included in the controlling organization's gross income | 6. Deductions directly connected with income in column 5 |
|---|---|---|---|---|---|---|
| (1) | | | | | | |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |

**Nonexempt Controlled Organizations**

| | 7. Taxable income | 8. Net unrelated income (loss) (see instructions) | 9. Total of specified payments made | 10. Part of column 9 that is included in the controlling organization's gross income | 11. Deductions directly connected with income in column 10 |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| Totals . . . . . . . . . . . . . . . ▶ | | | | Add columns 5 and 10. Enter here and on page 1, Part I, line 8, column (A). | Add columns 6 and 11. Enter here and on page 1, Part I, line 8, column (B). |

Form **990-T** (2012)

T1 002503

Form 990-T (2012)

## Schedule G—Investment Income of a Section 501(c)(7), (9), or (17) Organization (see instructions)

Page 4

| 1. Description of income | 2. Amount of income | 3. Deductions directly connected (attach statement) | 4. Set-asides (attach statement) | 5. Total deductions and set-asides (col. 3 plus col. 4) |
|---|---|---|---|---|
| (1) INTEREST INCOME | | | | |
| (2) | 4136 | 0 | 4000 | |
| (3) | | | | 4000 |
| (4) | | | | |
| Totals ▶ | Enter here and on page 1, Part I, line 9, column (A). | | | Enter here and on page 1, Part I, line 9, column (B). |
| | 4136 | | | 4000 |

## Schedule I—Exploited Exempt Activity Income, Other Than Advertising Income (see instructions)

| 1. Description of exploited activity | 2. Gross unrelated business income from trade or business | 3. Expenses directly connected with production of unrelated business income | 4. Net income (loss) from unrelated trade or business (column 2 minus column 3). If a gain, compute cols. 5 through 7. | 5. Gross income from activity that is not unrelated business income | 6. Expenses attributable to column 5 | 7. Excess exempt expenses (column 6 minus column 5, but not more than column 4). |
|---|---|---|---|---|---|---|
| (1) | | | | | | |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |
| Totals ▶ | Enter here and on page 1, Part I, line 10, col. (A). | Enter here and on page 1, Part I, line 10, col. (B). | | | | Enter here and on page 1, Part II, line 26. |

## Schedule J—Advertising Income (see instructions)

### Part I   Income From Periodicals Reported on a Consolidated Basis

| 1. Name of periodical | 2. Gross advertising income | 3. Direct advertising costs | 4. Advertising gain or (loss) (col. 2 minus col. 3). If a gain, compute cols. 5 through 7. | 5. Circulation income | 6. Readership costs | 7. Excess readership costs (column 6 minus column 5, but not more than column 4). |
|---|---|---|---|---|---|---|
| (1) | | | | | | |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |
| Totals (carry to Part II, line (5)) ▶ | | | | | | |

### Part II   Income From Periodicals Reported on a Separate Basis (For each periodical listed in Part II, fill in columns 2 through 7 on a line-by-line basis.)

| 1. Name of periodical | 2. Gross advertising income | 3. Direct advertising costs | 4. Advertising gain or (loss) (col. 2 minus col. 3). If a gain, compute cols. 5 through 7. | 5. Circulation income | 6. Readership costs | 7. Excess readership costs (column 6 minus column 5, but not more than column 4). |
|---|---|---|---|---|---|---|
| (1) | | | | | | |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |
| Totals from Part I | | | | | | |
| Totals, Part II (lines 1-5) ▶ | Enter here and on page 1, Part I, line 11, col. (A). | Enter here and on page 1, Part I, line 11, col. (B). | | | | Enter here and on page 1, Part II, line 27. |

## Schedule K—Compensation of Officers, Directors, and Trustees (see instructions)

| 1. Name | 2. Title | 3. Percent of time devoted to business | 4. Compensation attributable to unrelated business |
|---|---|---|---|
| (1) | | % | |
| (2) | | % | |
| (3) | | % | |
| (4) | | % | |
| Total. Enter here and on page 1, Part II, line 14 ▶ | | | |

Form 990-T (2012)

Form **990**

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

► The organization may have to use a copy of this return to satisfy state reporting requirements.

OMB No. 1545-0047

**2012**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2012 calendar year, or tax year beginning _____ 2012, and ending _____ 20 ___

| B Check if applicable: | C Name of organization FORT LAUDERDALE BRIDGE CLUB | | D Employer identification number |
|---|---|---|---|
| ☐ Address change | Doing Business As | | 59-0947504 |
| ☐ Name change | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | E Telephone number |
| ☐ Initial return | 700 NE 6TH TERRACE | | 954-761-1577 |
| ☐ Terminated | City, town or post office, state, and ZIP code | | |
| ☐ Amended return | FORT LAUDERDALE, FL 33304 | | G Gross receipts $ 272694 |
| ☐ Application pending | F Name and address of principal officer: KEITH GELLMAN | | H(a) Is this a group return for affiliates? ☐ Yes ☑ No |
| | 1775 N. ANDREWS AVE., #205W, FT. LAUDERDALE, FL 33311 | | H(b) Are all affiliates included? ☐ Yes ☐ No |
| I Tax-exempt status: ☐ 501(c)(3) ☑ 501(c) ( 7 ) ◄ (insert no.) ☐ 4947(a)(1) or ☐ 527 | | | If "No," attach a list. (see instructions) |
| J Website: ► WWW.FTLBC.COM | | | H(c) Group exemption number ► |
| K Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other ► | | L Year of formation: 1959 | M State of legal domicile: FL |

## Part I  Summary

| | | | |
|---|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: AS STATED IN THE CHARTER. THE PURPOSES OF THIS CORPORATION ARE TO PROMOTE AND PRESERVE WITHOUT INTENTION OF PECUNIARY GAIN, THE BEST INTERESTS OF THE GAME OF DUPLICATE BRIDGE AND TO CONDUCT SUCH OTHER ACTIVITIES AS MAY BE IN KEEPING WITH ITS PRINCIPAL OBJECTIVE AND APPROVED BY THE BOARD OF GOVERNORS. (THE BOARD) | | |
| 2 | Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 12 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 12 |
| 5 | Total number of individuals employed in calendar year 2012 (Part V, line 2a) | 5 | 1 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 15 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, line 34 | 7b | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| 8 | Contributions and grants (Part VIII, line 1h) | 18963 | 16995 |
| 9 | Program service revenue (Part VIII, line 2g) | 23623B | 252264 |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 4808 | 4138 |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 4193 | 200 |
| 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 254102 | 272595 |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3) | | |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 8582 |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | |
| b | Total fundraising expenses (Part IX, column (D), line 25) ► | | |
| 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 273901 | 280860 |
| 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 273801 | 289442 |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | -9699 | -16847 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| 20 | Total assets (Part X, line 16) | 586792 | 579786 |
| 21 | Total liabilities (Part X, line 26) | 86 | 6414 |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 586706 | 573372 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | Signature of officer *(signed)* Keith Gellman | Date 2/17/13 |
|---|---|---|
| | Type or print name and title KEITH GELLMAN  TREASURER | |

| Paid Preparer Use Only | Print/Type preparer's name MARK LAFONTAINE, MST | Preparer's signature *(signed)* | Date 1/29/13 | Check ☐ if self-employed | PTIN P01293166 |
|---|---|---|---|---|---|
| | Firm's name ► LAFONTAINE AND ASSOCIATES INC. | | | Firm's EIN ► 26-4081665 | |
| | Firm's address ► 5100 N. FEDERAL HIGHWAY, SUITE 497, FT. LAUDERDALE, FL 33308 | | | Phone no. 954-495-4565 | |

May the IRS discuss this return with the preparer shown above? (see instructions)    ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.    Cat. No. 11282Y    Form **990** (2012)

Form 990 (2012)

## Part III   Statement of Program Service Accomplishments

Page 2

Check if Schedule O contains a response to any question in this Part III . . . . . . . . . . . . □

1   Briefly describe the organization's mission:
AS STATED IN THE CHARTER, THE PURPOSES OF THIS CORPORATION ARE TO PROMOTE AND PRESERVE WITHOUT INTENTION
OF PECUNIARY GAIN, THE BEST INTERESTS OF THE GAME OF DUPLICATE BRIDGE AND TO CONDUCT SUCH OTHER ACTIVITIES
AS MAY BE IN KEEPING WITH ITS PRINCIPAL OBJECTIVE AND APPROVED BY THE BOARD OF GOVERNORS, (THE BOARD)

2   Did the organization undertake any significant program services during the year which were not listed on the
prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . □ Yes ☑ No
If "Yes," describe these new services on Schedule O.

3   Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . □ Yes ☑ No
If "Yes," describe these changes on Schedule O.

4   Describe the organization's program service accomplishments for each of its three largest program services, as measured by
expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others,
the total expenses, and revenue, if any, for each program service reported.

4a   (Code: _____ ) (Expenses $ _____ 177183 including grants of $ _____ 0 ) (Revenue $ _____ 236131 )
BRIDGE GAME ENTRY FEES, SUPPLIES AND GAME FEE EXPENSES

4b   (Code: _____ ) (Expenses $ _____ 11310 including grants of $ _____ 0 ) (Revenue $ _____ 14133 )
SCRABBLE GAMES AND MISCELLANEOUS

4c   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

4d   Other program services (Describe in Schedule O.)
(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

4e   Total program service expenses ▶ _____ 188493

Form 990 (2012)

T1 002506

Form 990 (2012)

## Part IV   Checklist of Required Schedules

Page **3**

|  |  | Yes | No |
|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | | ✓ |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | | ✓ |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . . . | **3** | | ✓ |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . | **4** | | ✓ |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | | ✓ |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* . . . . . . . . . . . . . . . . . . | **6** | | ✓ |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . | **7** | | ✓ |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . . . . . . . . | **8** | | ✓ |
| **9** | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . | **9** | | ✓ |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If "Yes," complete Schedule D, Part V* . . | **10** | | ✓ |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* . . . . . . . . . . . . . . . . . . . . | **11a** | ✓ | |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . | **11b** | | ✓ |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . | **11c** | | ✓ |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . | **11d** | | ✓ |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | | ✓ |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | ✓ |
| **12 a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . . . . . . | **12a** | | ✓ |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* . . . . | **12b** | | ✓ |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* . . . | **13** | | ✓ |
| **14 a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . | **14a** | | ✓ |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . . . . | **14b** | | ✓ |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or assistance to any organization or entity located outside the United States? *If "Yes," complete Schedule F, Parts II and IV* . . | **15** | | ✓ |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or assistance to individuals located outside the United States? *If "Yes," complete Schedule F, Parts III and IV* . . . | **16** | | ✓ |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I (see instructions)* . . . . | **17** | | ✓ |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . | **18** | | ✓ |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . . . | **19** | | ✓ |
| **20 a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . | **20a** | | ✓ |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |

Form 990 (2012)

Form 990 (2012)

**Part IV    Checklist of Required Schedules** (continued)

Page **4**

| | | Yes | No |
|---|---|---|---|
| 21 | Did the organization report more than $5,000 of grants and other assistance to any government or organization in the United States on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . . | **21** | | ✓ |
| 22 | Did the organization report more than $5,000 of grants and other assistance to individuals in the United States on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . | **22** | | ✓ |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . | **23** | | ✓ |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25* . . . . . . . . . . . . | **24a** | | ✓ |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . | **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . | **24c** | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . | **24d** | | |
| 25a | **Section 501(c)(3) and 501(c)(4) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . . | **25a** | | ✓ |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . | **25b** | | ✓ |
| 26 | Was a loan to or by a current or former officer, director, trustee, key employee, highest compensated employee, or disqualified person outstanding as of the end of the organization's tax year? *If "Yes," complete Schedule L, Part II* | **26** | | ✓ |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . | **27** | | ✓ |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . | **28a** | | ✓ |
| b | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . | **28b** | | ✓ |
| c | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . | **28c** | | ✓ |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | **29** | | ✓ |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . | **30** | | ✓ |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . . . . . . . . . . . . . . . . . . . . | **31** | | ✓ |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . | **32** | | ✓ |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . | **33** | | ✓ |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . | **34** | | ✓ |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . | **35a** | | ✓ |
| b | If "Yes" to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . | **35b** | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . | **36** | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . . . . . . . . . . . . . . . . . . . . | **37** | | ✓ |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? Note. All Form 990 filers are required to complete Schedule O . . . . . . . | **38** | ✓ | |

Form **990** (2012)

T1 002508

Form 990 (2012)                                                                                              Page **5**

| **Part V** | **Statements Regarding Other IRS Filings and Tax Compliance** | | |
|---|---|---|---|

Check if Schedule O contains a response to any question in this Part V . . . . . . . . . . ☐

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable | | **1a** | 841 | | |
| b | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . . . | | **1b** | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | | **1c** | ✓ | |
| 2a | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | | **2a** | 1 | | |
| b | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | | | **2b** | ✓ | |
| | Note. If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) . . | | | | | | |
| 3a | Did the organization have unrelated business gross income of $1,000 or more during the year? . . | | | | **3a** | ✓ | |
| b | If "Yes," has it filed a Form 990-T for this year? If "No," provide an explanation in Schedule O . . . | | | | **3b** | ✓ | |
| 4a | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . . . . . . . . . . . . . . . . . | | | | **4a** | | ✓ |
| b | If "Yes," enter the name of the foreign country: ▶ | | | | | | |
| | See instructions for filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts. | | | | | | |
| 5a | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | | | | **5a** | | ✓ |
| b | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | | **5b** | | ✓ |
| c | If "Yes" to line 5a or 5b, did the organization file Form 8886-T? | | | | **5c** | | |
| 6a | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | | | **6a** | | ✓ |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | | **6b** | | |
| 7 | Organizations that may receive deductible contributions under section 170(c). | | | | | | |
| a | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . | | | | **7a** | | |
| b | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . | | | | **7b** | | |
| c | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . | | | | **7c** | | |
| d | If "Yes," indicate the number of Forms 8282 filed during the year . . . . . | | **7d** | | | | |
| e | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | | **7e** | | |
| f | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . | | | | **7f** | | |
| g | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | | | | **7g** | | |
| h | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | | | | **7h** | | |
| 8 | Sponsoring organizations maintaining donor advised funds and section 509(a)(3) supporting organizations. Did the supporting organization, or a donor advised fund maintained by a sponsoring organization, have excess business holdings at any time during the year? . . . . . . . | | | | **8** | | |
| 9 | Sponsoring organizations maintaining donor advised funds. | | | | | | |
| a | Did the organization make any taxable distributions under section 4966? . . . . . . . . | | | | **9a** | | |
| b | Did the organization make a distribution to a donor, donor advisor, or related person? . . . . . | | | | **9b** | | |
| 10 | Section 501(c)(7) organizations. Enter: | | | | | | |
| a | Initiation fees and capital contributions included on Part VIII, line 12 . . . . . . | | **10a** | 15995 | | |
| b | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | | **10b** | 9241 | | |
| 11 | Section 501(c)(12) organizations. Enter: | | | | | | |
| a | Gross income from members or shareholders . . . . . . . . . . . | | **11a** | | | |
| b | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . . . | | **11b** | | | |
| 12a | Section 4947(a)(1) non-exempt charitable trusts. Is the organization filing Form 990 in lieu of Form 1041? | | | | **12a** | | |
| b | If "Yes," enter the amount of tax-exempt interest received or accrued during the year . . | | **12b** | | | |
| 13 | Section 501(c)(29) qualified nonprofit health insurance issuers. | | | | | | |
| a | Is the organization licensed to issue qualified health plans in more than one state? . . . . . | | | | **13a** | | |
| | Note. See the instructions for additional information the organization must report on Schedule O. | | | | | | |
| b | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | | **13b** | | | |
| c | Enter the amount of reserves on hand . . . . . . . . . . . . | | **13c** | | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? . . . | | | | **14a** | | |
| b | If "Yes," has it filed a Form 720 to report these payments? If "No," provide an explanation in Schedule O . | | | | **14b** | | |

Form **990** (2012)

Form 990 (2012)

**Page 6**

**Part VI** Governance, Management, and Disclosure *For each "Yes" response to lines 2 through 7b below, and for a "No" response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response to any question in this Part VI . . . . . . . . . . ☑

**Section A. Governing Body and Management**

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year . | 1a | 12 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | 12 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . . | | | 2 | | ✓ |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, or trustees, or key employees to a management company or other person? | | | 3 | ✓ | |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | | 4 | | ✓ |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? . | | | 5 | | ✓ |
| 6 | Did the organization have members or stockholders? . . . . . . . . . . . . . . . | | | 6 | ✓ | |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . | | | 7a | ✓ | |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . | | | 7b | ✓ | |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? . . . . . . . . . . . . . . . . . . . . . . . | | | 8a | ✓ | |
| b | Each committee with authority to act on behalf of the governing body? . . . . . . . . | | | 8b | ✓ | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O.* . . . | | | 9 | | ✓ |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . | 10a | | ✓ |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | ✓ | |
| b | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | | ✓ |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . | 12c | | |
| 13 | Did the organization have a written whistleblower policy? . . . . . . . . . . . . | 13 | | ✓ |
| 14 | Did the organization have a written document retention and destruction policy? . . . . . . | 14 | | ✓ |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official . . . . . . . . | 15a | ✓ | |
| b | Other officers or key employees of the organization . . . . . . . . . . . . . | 15b | ✓ | |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . | 16a | | ✓ |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . | 16b | | |

**Section C. Disclosure**

17 List the states with which a copy of this Form 990 is required to be filed ▶ FLORIDA

18 Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (Section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website   ☐ Another's website   ☑ Upon request   ☐ Other *(explain in Schedule O)*

19 Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

20 State the name, physical address, and telephone number of the person who possesses the books and records of the organization: ▶ KEITH GELLMAN, 1775 N. ANDREWS AVE, #205W, FT. LAUDERDALE, FL  33311, 954-463-7011

Form **990** (2012)

Form 990 (2012)                                                                                                    Page 7

**Part VII** | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors

Check if Schedule O contains a response to any question in this Part VII . . . . . . . . . . . . . ☑

**Section A.  Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

• List all of the organization's current officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

• List all of the organization's current key employees, if any. See instructions for definition of "key employee."

• List the organization's five current highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

• List all of the organization's former officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

• List all of the organization's former directors or trustees that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☑  Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) ALLEN BOZEK PRESIDENT | | | | ✓ | | | | 0 | 0 | 0 |
| (2) BARBARA TATE VICE-PRESIDENT | | | | ✓ | | | | 0 | 0 | 0 |
| (3) TOM MCKAY SECRETARY | | | | ✓ | | | | 0 | 0 | 0 |
| (4) KEITH GELLMAN TREASURER | | | | ✓ | | | | 0 | 0 | 0 |
| (5) BARBARA AUGUST DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (6) JOHN HART DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (7) GLORIA EZRIN DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (8) FRAN MENZEL DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (9) HARVEY HOFFENBERG DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (10) BETTY WINGATE DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (11) MARY SHORT DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (12) RON WEISSBERGER DIRECTOR | | ✓ | | | | | | 0 | 0 | 0 |
| (13) | | | | | | | | | | |
| (14) | | | | | | | | | | |

Form **990** (2012)

T1 002511

Form 990 (2012)                                                                                       Page **8**

| Part VII | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)* | | | | | | | | | |

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| **(15) GREGGORY A. VAN DYKE** | 30 | | | | | | | | | |
| CLUB MANAGER | | | | | | ✓ | | 7739.50 | 0 | 0 |
| (16) | | | | | | | | | | |
| (17) | | | | | | | | | | |
| (18) | | | | | | | | | | |
| (19) | | | | | | | | | | |
| (20) | | | | | | | | | | |
| (21) | | | | | | | | | | |
| (22) | | | | | | | | | | |
| (23) | | | | | | | | | | |
| (24) | | | | | | | | | | |
| (25) | | | | | | | | | | |
| 1b  Sub-total . . . . . . . . . . . ▶ | | | | | | | | 7739.50 | 0 | 0 |
| c  Total from continuation sheets to Part VII, Section A . . . ▶ | | | | | | | | | 0 | 0 |
| d  Total (add lines 1b and 1c) . . . . . . ▶ | | | | | | | | 7739.50 | 0 | 0 |

2   Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | Yes | No |
|---|---|---|---|
| 3 | Did the organization list any former officer, director, or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . | **3** | | ✓ |
| 4 | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . | **4** | | ✓ |
| 5 | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . | **5** | | ✓ |

**Section B. Independent Contractors**

1   Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

2   Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶

Form **990** (2012)

T1 002512

Form 990 (2012)                                                                                    Page **9**

**Part VIII**  **Statement of Revenue**

Check if Schedule O contains a response to any question in this Part VIII. ☐

| | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512, 513, or 514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | 1a | Federated campaigns | 1a | | | |
| | b | Membership dues | 1b | 15995 | | |
| | c | Fundraising events | 1c | | | |
| | d | Related organizations | 1d | | | |
| | e | Government grants (contributions) | 1e | | | |
| | f | | | | | |
| | g | | | | | |
| | h | **Total.** Add lines 1a–1f ▶ | 15995 | | | |
| **Program Service Revenue** | | | Business Code | | | |
| | 2a | ENTRY FEES: BRIDGE GAMES | | 238131 | 238131 | |
| | b | SCRABBLE, MISC. INCOME | | 14133 | 14133 | |
| | c | | | | | |
| | d | | | | | |
| | e | | | | | |
| | f | All other program service revenue | | | | |
| | g | **Total.** Add lines 2a–2f ▶ | 252264 | | | |
| | 3 | Investment income (including dividends, interest, and other similar amounts) ▶ | 4136 | | | 4136 |
| | 4 | Income from investment of tax-exempt bond proceeds ▶ | | | | |
| | 5 | Royalties ▶ | | | | |
| | | | (i) Real | (ii) Personal | | |
| | 6a | Gross rents | | | | |
| | b | Less: rental expenses | | | | |
| | c | Rental income or (loss) | | | | |
| | d | Net rental income or (loss) ▶ | | | | |
| | 7a | | | | | |
| | b | Less: cost or other basis and sales expenses | | | | |
| | c | Gain or (loss) | | | | |
| | d | Net gain or (loss) ▶ | | | | |
| **Other Revenue** | 8a | Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 a | | | | |
| | b | Less: direct expenses b | | | | |
| | c | Net income or (loss) from fundraising events ▶ | | | | |
| | 9a | Gross income from gaming activities. See Part IV, line 19 a | | | | |
| | b | Less: direct expenses b | | | | |
| | c | Net income or (loss) from gaming activities ▶ | | | | |
| | 10a | Gross sales of inventory, less returns and allowances a | | | | |
| | b | Less: cost of goods sold b | | | | |
| | c | Net income or (loss) from sales of inventory ▶ | | | | |
| | | Miscellaneous Revenue | Business Code | | | |
| | 11a | RESTRICTED DONATIONS | | 200 | 200 | |
| | b | | | | | |
| | c | | | | | |
| | d | All other revenue | | | | |
| | e | **Total.** Add lines 11a–11d ▶ | 200 | | | |
| | 12 | **Total revenue.** See instructions ▶ | 272595 | 252464 | 4136 | 0 |

Form **990** (2012)

T1 002513

Form 990 (2012)                                                                                                          Page **10**

**Part IX** | **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response to any question in this Part IX . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | (A)<br>Total expenses | (B)<br>Program service expenses | (C)<br>Management and general expenses | (D)<br>Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to governments and organizations in the United States. See Part IV, line 21 | | | | |
| **2** Grants and other assistance to individuals in the United States. See Part IV, line 22 . . . | | | | |
| **3** Grants and other assistance to governments, organizations, and individuals outside the United States. See Part IV, lines 15 and 16 . . | | | | |
| **4** Benefits paid to or for members . . . | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . | 7740 | 7740 | 0 | 0 |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . | | | | |
| **7** Other salaries and wages . . . . . | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | | | | |
| **9** Other employee benefits . . . . . | | | | |
| **10** Payroll taxes . . . . . . . . | 842 | 842 | 0 | 0 |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . | 91139 | 91139 | 0 | 0 |
| **b** Legal . . . . . . . . . . | 55213 | 0 | 55213 | 0 |
| **c** Accounting . . . . . . . . | 1225 | 0 | 1225 | 0 |
| **d** Lobbying . . . . . . . . . | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees . . . | | | | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O.) | 623 | 0 | 623 | 0 |
| **12** Advertising and promotion . . . . | 4284 | 4284 | 0 | 0 |
| **13** Office expenses . . . . . . . | 5076 | 0 | 5076 | 0 |
| **14** Information technology . . . . . | | | | |
| **15** Royalties . . . . . . . . . | | | | |
| **16** Occupancy . . . . . . . . | 40250 | 36225 | 4025 | 0 |
| **17** Travel . . . . . . . . . . | | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| **19** Conferences, conventions, and meetings . | | | | |
| **20** Interest . . . . . . . . . | | | | |
| **21** Payments to affiliates . . . . . | | | | |
| **22** Depreciation, depletion, and amortization . | 12407 | 0 | 12407 | 0 |
| **23** Insurance . . . . . . . . . | 19144 | 0 | 19144 | 0 |
| **24** Other expenses. Itemize expenses not covered above. (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** GAME FEE EXPENSES | 34610 | 34610 | 0 | 0 |
| **b** BRIDGE SUPPLIES | 4566 | 4566 | 0 | 0 |
| **c** HOSPITALITY EXPENSE | 14525 | 14525 | 0 | 0 |
| **d** SPECIAL EVENT EXPENSE | 4562 | 4562 | 0 | 0 |
| **e** All other expenses MISC. EXPENSES | 2236 | 0 | 2236 | 0 |
| **25** Total functional expenses. Add lines 1 through 24e | 289442 | 188493 | 100949 | 0 |
| **26** Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) . . . | | | | |

Form **990** (2012)

T1 002514

Form 990 (2012)

Page **11**

## Part X | Balance Sheet

Check if Schedule O contains a response to any question in this Part X . . . . . . . . . . ☐

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| | 1 | Cash—non-interest-bearing . . . . . . . . | 117012 | 1 | 103064 |
| | 2 | Savings and temporary cash investments . . . . . . | 180605 | 2 | 169504 |
| | 3 | Pledges and grants receivable, net . . . . . . | | 3 | |
| | 4 | Accounts receivable, net . . . . . . | | 4 | |
| **Assets** | 5 | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L . . . . . . | | 5 | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions). Complete Part II of Schedule L . . . . . . | | 6 | |
| | 7 | Notes and loans receivable, net . . . . . . | | 7 | |
| | 8 | Inventories for sale or use . . . . . . | | 8 | |
| | 9 | Prepaid expenses and deferred charges . . . . . . | | 9 | |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D | 10a | 524174 | |
| | b | Less: accumulated depreciation . . . | 10b | 221956 | |
| | | | 289175 | 10c | 302218 |
| | 11 | Investments—publicly traded securities . . . . . . | | 11 | |
| | 12 | Investments—other securities. See Part IV, line 11 . . . | | 12 | |
| | 13 | Investments—program-related. See Part IV, line 11 . . . | | 13 | |
| | 14 | Intangible assets . . . . . . | | 14 | |
| | 15 | Other assets. See Part IV, line 11 . . . . . . | 0 | 15 | 5000 |
| | 16 | Total assets. Add lines 1 through 15 (must equal line 34) . . . . . . | 586792 | 16 | 579786 |
| **Liabilities** | 17 | Accounts payable and accrued expenses . . . . . . | 86 | 17 | 6414 |
| | 18 | Grants payable . . . . . . | | 18 | |
| | 19 | Deferred revenue . . . . . . | | 19 | |
| | 20 | Tax-exempt bond liabilities . . . . . . | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D . | | 21 | |
| | 22 | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L . . . . . . | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D . . . . . . | | 25 | |
| | 26 | Total liabilities. Add lines 17 through 25 . . . . . . | 86 | 26 | 6414 |
| **Net Assets or Fund Balances** | | Organizations that follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34. | | | |
| | 27 | Unrestricted net assets . . . . . . | | 27 | |
| | 28 | Temporarily restricted net assets . . . . . . | | 28 | |
| | 29 | Permanently restricted net assets . . . . . . | | 29 | |
| | | Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☑ and complete lines 30 through 34. | | | |
| | 30 | Capital stock or trust principal, or current funds . . . . . . | | 30 | |
| | 31 | Paid-in or capital surplus, or land, building, or equipment fund . . . | | 31 | |
| | 32 | Retained earnings, endowment, accumulated income, or other funds . | 586706 | 32 | 573372 |
| | 33 | Total net assets or fund balances . . . . . . | 586706 | 33 | 573372 |
| | 34 | Total liabilities and net assets/fund balances . . . . . . | 586792 | 34 | 579786 |

Form 990 (2012)

T1 002515

Form 990 (2012)                                                                                    Page **12**

## Part XI  Reconciliation of Net Assets

Check if Schedule O contains a response to any question in this Part XI . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . | **1** | 272595 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . | **2** | 289442 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . . | **3** | -16847 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . . | **4** | 586708 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . | **5** | 4136 |
| 6 | Donated services and use of facilities . . . . . . . . . . | **6** | 0 |
| 7 | Investment expenses . . . . . . . . . . | **7** | -625 |
| 8 | Prior period adjustments . . . . . . . . . . | **8** | 0 |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . | **9** | 0 |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) . . . . . . . . . . | **10** | 573372 |

## Part XII  Financial Statements and Reporting

Check if Schedule O contains a response to any question in this Part XII . . . . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash  ☑ Accrual  ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? . . . <br> If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: <br> ☑ Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | **2a** ✓ | |
| b | Were the organization's financial statements audited by an independent accountant? . . . . . . . <br> If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: <br> ☐ Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | **2b** | ✓ |
| c | If "Yes" to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? <br> If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | **2c** ✓ | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? . . . . . . . . . . | **3a** | ✓ |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | |

Form 990 (2012)

**SCHEDULE D**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes," to Form 990,
Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990. ▶ See separate instructions.

OMB No. 1545-0047

## 2012

Open to Public
Inspection

Name of the organization

FORT LAUDERDALE BRIDGE CLUB

Employer Identification number

59-0947504

**Part I**  **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.** Complete if the
organization answered "Yes" to Form 990, Part IV, line 6.

|  |  | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . | | |
| 2 | Aggregate contributions to (during year) . | | |
| 3 | Aggregate grants from (during year) . | | |
| 4 | Aggregate value at end of year . . . | | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised
funds are the organization's property, subject to the organization's exclusive legal control? . . . . . . . . ☐ Yes ☐ No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used
only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose
conferring impermissible private benefit? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

**Part II**  **Conservation Easements.** Complete if the organization answered "Yes" to Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e.g., recreation or education)   ☐ Preservation of an historically important land area
☐ Protection of natural habitat                                         ☐ Preservation of a certified historic structure
☐ Preservation of open space

2  Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation
easement on the last day of the tax year.

|  |  |  | Held at the End of the Tax Year |
|---|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . | 2a | |
| b | Total acreage restricted by conservation easements . . . . . | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) . | 2c | |
| d | Number of conservation easements included in (c) acquired after 8/17/06, and not on a historic structure listed in the National Register | 2d | |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the
tax year ▶

4  Number of states where property subject to conservation easement is located ▶

5  Does the organization have a written policy regarding the periodic monitoring, inspection, handling of
violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . . . . ☐ Yes ☐ No

6  Staff and volunteer hours devoted to monitoring, inspecting, and enforcing conservation easements during the year
▶

7  Amount of expenses incurred in monitoring, inspecting, and enforcing conservation easements during the year
▶ $

8  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)
(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

9  In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and
balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the
organization's accounting for conservation easements.

**Part III**  **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" to Form 990, Part IV, line 8.

1a  If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet
works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of
public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b  If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet
works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of
public service, provide the following amounts relating to these items:

|  |  |  |  |
|---|---|---|---|
| | (i) Revenues included in Form 990, Part VIII, line 1 . . . . . . . . . . . . ▶ $ | | |
| | (ii) Assets included in Form 990, Part X . . . . . . . . . . . . . . . ▶ $ | | |

2  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the
following amounts required to be reported under SFAS 116 (ASC 958) relating to these items:

a  Revenues included in Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . ▶ $

b  Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . ▶ $

For Paperwork Reduction Act Notice, see the Instructions for Form 990.          Cat. No. 52283D          Schedule D (Form 990) 2012

Schedule D (Form 990) 2012

**Part III   Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*   Page **2**

3   Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a  ☐ Public exhibition
b  ☐ Scholarly research
c  ☐ Preservation for future generations
d  ☐ Loan or exchange programs
e  ☐ Other

4   Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

5   During the year, did the organization solicit or receive donations of art, historical treasures, or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?   ☐ Yes ☐ No

**Part IV   Escrow and Custodial Arrangements.** Complete if the organization answered "Yes" to Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a  Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X?   ☐ Yes ☐ No

b  If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | Amount |
|---|---|---|
| c  Beginning balance | 1c | |
| d  Additions during the year | 1d | |
| e  Distributions during the year | 1e | |
| f  Ending balance | 1f | |

2a  Did the organization include an amount on Form 990, Part X, line 21?   ☐ Yes ☐ No

b  If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII   ☐

**Part V   Endowment Funds.** Complete if the organization answered "Yes" to Form 990, Part IV, line 10.

| | | (a) Current year | (b) Prior year | (c) Two years back | (d) Three years back | (e) Four years back |
|---|---|---|---|---|---|---|
| 1a | Beginning of year balance | | | | | |
| b | Contributions | | | | | |
| c | Net investment earnings, gains, and losses | | | | | |
| d | Grants or scholarships | | | | | |
| e | Other expenditures for facilities and programs | | | | | |
| f | Administrative expenses | | | | | |
| g | End of year balance | | | | | |

2   Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:
a  Board designated or quasi-endowment ▶ _____ %
b  Permanent endowment ▶ _____ %
c  Temporarily restricted endowment ▶ _____ %
The percentages in lines 2a, 2b, and 2c should equal 100%.

3a  Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| (i) unrelated organizations | 3a(i) | | |
| (ii) related organizations | 3a(ii) | | |
| b  If "Yes" to 3a(ii), are the related organizations listed as required on Schedule R? | 3b | | |

4   Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI   Land, Buildings, and Equipment.** See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciation | (d) Book value |
|---|---|---|---|---|
| 1a  Land | 45000 | 0 | | 45000 |
| b  Buildings | 405000 | 0 | | 405000 |
| c  Leasehold improvements | 45668 | 0 | | 45668 |
| d  Equipment | 28506 | 0 | | 28506 |
| e  Other | | | 221956 | -221956 |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* ▶ | | | | 302218 |

Schedule D (Form 990) 2012

Schedule D (Form 990) 2012

### Part VII  Investments—Other Securities. See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives . . . . . . . . | | |
| (2) Closely-held equity interests . . . . . | | |
| (3) Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| (I) | | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 12.) ▶ | | |

### Part VIII  Investments—Program Related. See Form 990, Part X, line 13.

| (a) Description of investment type | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| (10) | | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 13.) ▶ | | |

### Part IX  Other Assets. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| (10) | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 15.) . . . . . . . . . . ▶ | |

### Part X  Other Liabilities. See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Book value | |
|---|---|---|
| (1) Federal income taxes | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| (10) | | |
| (11) | | |
| Total. (Column (b) must equal Form 990, Part X, col. (B) line 25.) ▶ | | |

2. FIN 48 (ASC 740) Footnote. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII . . . ☐

Schedule D (Form 990) 2012

Schedule D (Form 990) 2012            Page 4

**Part XI   Reconciliation of Revenue per Audited Financial Statements With Revenue per Return**

| | | | |
|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements . . . . . . . | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | |
| a | Net unrealized gains on investments . . . . . . . . . | 2a | |
| b | Donated services and use of facilities . . . . . . . . | 2b | |
| c | Recoveries of prior year grants . . . . . . . . . | 2c | |
| d | Other (Describe in Part XIII.) . . . . . . . . . | 2d | |
| e | Add lines 2a through 2d . . . . . . . . . . . | | 2e |
| 3 | Subtract line 2e from line 1 . . . . . . . . . . . | | 3 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1 : | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | 4a | |
| b | Other (Describe in Part XIII.) . . . . . . . . . | 4b | |
| c | Add lines 4a and 4b . . . . . . . . . . . | | 4c |
| 5 | Total revenue. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 12.)* . . . . . . . | | 5 |

**Part XII   Reconciliation of Expenses per Audited Financial Statements With Expenses per Return**

| | | | |
|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements . . . . . . . . | | 1 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | |
| a | Donated services and use of facilities . . . . . . . . | 2a | |
| b | Prior year adjustments . . . . . . . . . | 2b | |
| c | Other losses . . . . . . . | 2c | |
| d | Other (Describe in Part XIII.) . . . . . . . . | 2d | |
| e | Add lines 2a through 2d . . . . . . . . . . . | | 2e |
| 3 | Subtract line 2e from line 1 . . . . . . . . . . . | | 3 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line 1: | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | 4a | |
| b | Other (Describe in Part XIII.) . . . . . . . . . | 4b | |
| c | Add lines 4a and 4b . . . . . . . . . . . | | 4c |
| 5 | Total expenses. Add lines 3 and 4c. *(This must equal Form 990, Part I, line 18.)* . . . . . | | 5 |

**Part XIII   Supplemental Information**

Complete this part to provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

T1 002520

Schedule D (Form 990) 2012

Page **5**

## Part XIII   Supplemental Information (continued)

T1 002521

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.

▶ Attach to Form 990 or 990-EZ.

OMB No. 1545-0047

**2012**

Open to Public
Inspection

Name of the organization
FORT LAUDERDALE BRIDGE CLUB

Employer identification number
59-0947504

PART VI, SECTION A, LINE 3 - A CLUB HOUSE MANAGER WAS HIRED AS AN EMPLOYEE.

PART VI, SECTION A, LINE 6 - MEMBERSHIP REQUIRES DUES OF $25 RENEWAL OR $30 FOR A NEW MEMBER ANNUALLY.

PART VI, SECTION A, LINE 7a - THE BOARD IS ELECTED BY A MAJORITY OF ITS MEMBERSHIP.

PART VI, SECTION A, LINE 7b - CERTAIN COMMITTEES ARE GRANTED LIMITED POWER TO EXECUTE GOVERNANCE OF FINANCES,

MEMBERSHIP DISPUTES, ETC.

PART VI, SECTION A, LINE 8b - COMMITTEES REPORT TO THE GOVERNING BOARD AND THEIR REPORTS ARE DOCUMENTED

IN THE MINUTES OF THE BOARD MEETING.

PART VI, SECTION B, LINE 11b - A HARD COPY OF FORM 990 IS GIVEN TO EACH MEMBER OF THE GOVERNING BOARD FOR

REVIEW AND APPROVAL.

PART VI, SECTION B, LINE 15a - THE CLUB MANAGERS COMPENSATION IS REVIEWED ANNUALLY AND IS BASED UPON

COMPARABLE WAGES FOR THAT POSITION.

PART VI, SECTION C, LINE 19 - BYLAWS AND MINUTES OF THE GOVERNING BODY ARE AVAILABLE AT THE CLUB FOR ALL

MEMBERS TO REVIEW - INCLUDING FINANCIAL STATEMENTS.

For Paperwork Reduction Act Notice, see the instructions for Form 990 or 990-EZ.      Cat. No. 51056K      Schedule O (Form 990 or 990-EZ) (2012)

T1 002522

# EXHIBIT
# 3

## Office Services

**From:** Chad Pugatch
**Sent:** Thursday, May 09, 2013 11:11 AM
**To:** 'Thomas Abrams'; Rosich-Schwartz, Damaris  (USTP)
**Subject:** RE: The Fort Lauderdale Bridge Club, Inc. - Appointment of Trustee

I only add to my prior email that my client believes it to be essential that this matter is handled cost effectively.

Chad P. Pugatch, Esq.
Rice Pugatch Robinson & Schiller, P.A.
101 Northeast Third Avenue Suite 1800
Fort Lauderdale, Fl. 33301
(954) 462-8000
(954) 462-4300 (fax)
cpugatch@rprslaw.com

**From:** Thomas Abrams [mailto:tabrams@tabramslaw.com]
**Sent:** Thursday, May 09, 2013 10:55 AM
**To:** Rosich-Schwartz, Damaris (USTP)
**Cc:** Chad Pugatch
**Subject:** RE: The Fort Lauderdale Bridge Club, Inc. - Appointment of Trustee

We suggest Ken Welt. This case requires an independent minded trustee who can  run a small non profit business and
sort out the issues relating to this case .( Mr Kapila is also a potential choice, but I had consulted with his office and
another CPA  regarding potential representation regarding analysis of tax issues. There was no retention to date. I do
not know if that would render him in conflict) . Tom Abrams

Thomas L. Abrams, Esq.
1776 N. Pine Island Rd Suite 309
Fort Lauderdale, Florida 33922
Office: (954) 523-0900
Fax    : (954) 915-9016
tabrams@tabramslaw.com

CONFIDENTIALITY NOTICE:

This e-mail is intended only for the individual or entity to which it is addressed and may contain information that is
privileged,confidential and exempt from disclosure under applicable law. If you are not the intended recipient,you are
hereby notified that any dissemination,distribution or copying of this communication is strictly prohibited , and you are
requested to please notify us immediately by telephone , and return the message to us at the above address.

**From:** Rosich-Schwartz, Damaris (USTP) [mailto:Damaris.D.Rosich-Schwartz@usdoj.gov]
**Sent:** Thursday, May 09, 2013 10:40 AM
**To:** Thomas Abrams; Chad Pugatch (CPugatch@rprslaw.com)
**Subject:** RE: The Fort Lauderdale Bridge Club, Inc. - Appointment of Trustee

1

Rosen 003457

Please make sure to give me your written recommendations by today at noon so that I can forward to request to Steve T. He won't be in the office tomorrow so he might need to approve the trustee today.

Thank you,

Damaris D. Rosich-Schwartz, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
51 S.W. 1st Ave., Suite 1204
Miami, Florida 33130
Phone: (305) 536-6665
Fax: (305) 536-7360
Email: Damaris.D.Rosich-Schwartz@usdoj.gov

PRIVACY NOTICE:

This e-mail and any attachments are private and may be protected by privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Rosich-Schwartz, Damaris (USTP)
**Sent:** Wednesday, May 08, 2013 10:29 AM
**To:** Thomas L. Abrams (tabrams@tabramslaw.com); Chad Pugatch (CPugatch@rprslaw.com)
**Subject:** The Fort Lauderdale Bridge Club, Inc. - Appointment of Trustee
**Importance:** High

The Fort Lauderdale Bridge Club, Inc., Case No. 13-14289-BKC-RBR

The United States Trustee has been advised that you represent a creditor or the debtor in the above referenced bankruptcy case. As you are aware, the Court appointed a chapter 11 trustee at today's hearing.

Pursuant to its statutory responsibility under 11 U.S.C. § 1104(d) to consult with parties in interest, the United States Trustee hereby requests your written suggestions for the selection of the trustee.

If your client would like to make a suggestion for a chapter 11 trustee, please e-mail or fax to our Office, at your earliest convenience, but not later than noon tomorrow: (1) a brief description of any unique or specific matters that the appointed trustee will address during the administration of this case; (2) a description of the characteristics, skills and experience you believe the trustee should possess; and (3) the name(s) of any disinterested person(s) that you recommend that meet those attributes and can fulfill the trustee responsibilities in this case (ranked in order of preference). Please indicate who you represent.

Thank you for your immediate attention to this matter. We look forward to your response.

Thank you,

Damaris D. Rosich-Schwartz, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
51 S.W. 1st Ave., Suite 1204
Miami, Florida 33130
Phone: (305) 536-6665
Fax: (305) 536-7360
Email: Damaris.D.Rosich-Schwartz@usdoj.gov

2

Rosen 003458

# EXHIBIT
# 4



Home | The Joseph Samuel Isicoff Memorial Fund | Stories | The Board

# Archives: 2009 Sponsors & Donors

## Sponsors

### Shining Stars

- Shelley Family Foundation
- ABC/Svinga Bros.
- Steven Isicoff and Family

### Shooting Stars

- Exotech, INC
- Rice Pugatch Robinson & Schiller, PA

### Rising Stars

- Irving and Rhoda Isicoff
- Julie Feigeles
- Kahn/Carlin & Co., INC.
- All Florida Scrap Metal INC.
- The Farkas Family
- Maxwell Metals Group, Inc
- New High Glass, Inc
- NCF Insurance Assoc./Lucy Zelman's Learning Center
- Paul and Marte Singerman
- AMI Trading (USA), Inc.
- Jorge and Stacey Ruiz
- Isicoff Ragatz and Koenigsberg
- Patricia Redmond
- Larry Schantz and Adorno & Yoss

### Starlight

- Paula Wayne
- Susan and Charles Sand
- Gayle Dakof and Howard Liddle
- Federal Metals Co.
- Wolfe Metals Company
- Mercedes-Benz of Coral Gables
- 3 Points Paint and Body Works, Inc
- Allied Metal Corporation
- Sagre Law Firm, P.A.
- Service Aluminum Corp.
- Jan and Niki Spitzer
- Ana Landa
- Gamberg and Abrams
- Michael S. Mermelstein, CPA II, PA
- Michael and Stacey Sherman
- Louis and Ellen Wolfson

## 2011 Auction Donors

We want to thank the following 2009 auction donors:

- Dr. and Mrs. David and Philis Edelman
- Loree and Jeff Feller
- Bret Panter, Esq.
- Art and Soul, Washington, D.C.
- Wolfe's Wine Shoppe
- John W. Kozyak and Barbara Silverman
- Leonard Rothenberg, DDS, Orthodontics
- David Young
- Julie Feigeles
- Roasters and Toasters
- Chef David Schwadron
- Donna Levine Fine Jewelry

- Lucy Zelman Learning Center
- University of Miami/President Donna Shalala
- Turley's Jewelers
- Nose for Clothes
- The Ritz Carlton at Key Biscayne
- The Florida Marlins
- Colorhead
- Laurie Julia
- Victoria Lopez Castro
- The Leshaw Family
- Ceramics by Mayita
- Donald Pliner
- Pinecrest Health and Fitness
- Pinecrest Pilates
- Fran Farkas
- Perricone's Cafe
- Chef David Bracha of River Oyster Bar
- The Cupcake Diva
- Supershine Car Wash
- Morton's Steakhouse
- Perricones
- The Filling Station
- Allyson Feller
- Charlie de Lucca and Melrease International Links
- Jewelry by Jan
- Omar Ali
- Chef Allen Susser
- River Oyster Bar

In Kind Donors

- David Farkas
- Legal-eze Litigation Consulting and Graphics

**Get Involved**

Mail JSIMF
PO Box 420596
Miami, Florida 33242

Email: JSIMF@jsimemorialfund.org

Download Sponsorship form

**Special Thanks To**

Samuel Ullman, Esq.
Michael Mermelstein
David Farkas
Benjamin Farkas
Alexandra Heine
Kim Foster Design
Legal-eze Litigation Consulting & Graphics

**Archives**

2013 Sponsors & Donors  2011 Sponsors &
Donors
2010 Sponsors & Donors
2009 Sponsors & Donors

**CTRADA**

Multidimensional Family Therapy Program

Copyright, 2013, Contact Site Admin



Home   The Joseph Samuel Isicoff Memorial Fund   Stories   The Board

**Dear Friends, Family and Donors,**

After nine years the Joseph Samuel Isicoff Program at the University of Miami will be ending and, after eleven years, the Joseph Samuel Isicoff Memorial Fund, Inc. will be winding down.

Since Joseph died on March 14, 2004, you all have generously donated over $400,000, almost all of which has been used to support the wonderful work of the Joseph Samuel Isicoff Program of the Multi-Dimensional Family Therapy Program at the University of Miami School of Medicine. Since the JSIP was created, many children in our community have been helped – to graduate high school, to get their GED, to enter successful positions in the military, and get into colleges. You can read some of their stories on the "stories" page of our website. We are so proud of the work we have been able to support in Joseph's memory and so grateful to you for everything you have done to make this possible.

Although the JSIP will be concluding its long and productive association with the Multi-Dimensional Family Therapy Program at the University of Miami, children in foster care or others of limited financial resources, who are challenged by learning disability or difficulties, continue to need your support. These programs include, among others, Educate Tomorrow, Casa Valentina, SEED School of Miami and Summer Bridge. Children with similar challenges and needs also can be supported through the United Way or the Children's Trust. Whatever funds, if any, we have left over once the JSIP fulfills all of its final commitments will be donated to one or more of those worthwhile programs.

So please, in Joseph's memory, or in memory or honor of someone special to you, consider supporting any number of these programs.

The entire board of the Joseph Samuel Isicoff Memorial Fund Inc. and Laurel and I especially, thank you with all our hearts for everything you have done in memory of Joseph.

With gratitude,
Steven Isicoff
April 26, 2015

**Get Involved**
Mail JSIMF
PO Box 420596
Miami, Florida 33242

Email: JSIMF@jsimemorialfund.org

Download Sponsorship form

**Special Thanks To**
Samuel Ullman, Esq.
Michael Mermelstein
David Perkan
Benjamin Raices
Alexandre Haines
Kim Foster Design
Legal-ese Litigation Consulting & Graphics

**Archives**
2013 Sponsors & Donors
2011 Sponsors & Donors
2010 Sponsors & Donors
2009 Sponsors & Donors

**CTRADA**
Multidimensional Family Therapy Program

Copyright, 2013, Contact Site Admin



Home     The Joseph Samuel Isicoff Memorial Fund     Stories     The Board

# Archives: 2010 Sponsors & Donors

We had another wonderful, successful event, thanks to all of your support. We want to especially thank our sponsors and auction donors, all of whom are identified below, with a special thanks to our event Host Sabadell United Bank.

## Sponsors

### Shining Stars

- Shelley Family Foundation
- ABC/Svinga Bros.
- Steven Isicoff and Family

### Shooting Stars

- Mark, Royce and David Gussack-Exotech, INC
- Development Specialists, INC.

### Rising Stars

- NCF Insurance Assoc./Lucy Zelman's Learning Center
- Julie Feigeles
- Isicoff, Ragatz & Koenigsberg
- All Florida Scrap Metal, INC.
- Kahn Carlin & Co., INC.
- GDB International, INC.
- Paul and Marte Singerman
- Adorno & Yoss
- Jorge and Stacey Ruiz
- David and Philis Edelman
- Joe and Cheryl Rosen
- Jeremy and Fran Farkas
- Gayle Dakof and Howard Liddle
- Feldman Gale PA

### Starlight

- Paula Wayne
- Dr. and Mrs Charles and Susan Sand
- Maxwell Metals, INC.
- Michael and Stacey Sherman
- ELG Metals, INC.
- Berkowitz Dick Pollack and Brant
- John W. Kozyak and Barbara Silverman
- Michael S. Mermelstein, CPA
- Jay Koenigsberg
- Diversified Underwriters Services, INC.
- Barry and Judith Nelson Family Foundation
- Meland Russin & Budwick, PA
- Jontiff & Jontiff
- Patricia Redmond & Jerry Markowitz

### In Kind Sponsors

- Legal-eze Litigation Consulting & Graphics
- David Farkas
- Alexandra Helme

## 2011 Auction Donors

We want to thank the following 2010 auction donors:

- Walt Disney World Co.
- Richard and Barbara Manners

- Dino and Mindy Mora
- Paula Wayne
- The Florida Marlins
- Ceramics by Mayita
- The Miami Heat
- Britto
- Brett Panter, Esq.
- Sunset Corners Fine Wine and Spirits
- Pinecrest Pilates
- Jeff and Loree Feiler
- Ken Schurr and Valerie Manno-Schurr
- Tony from Colorhead
- Lucy Zelman's Learning Center
- Kim Yantis
- Wolfe's Wine Shoppe
- The Gilded Hand
- Mercedes Benz of Coral Gables
- Mary Krantzler
- Ritz Carlton, Key Biscayne
- Roasters & Toasters
- Bill and Patrice Brandt
- A Nose for Clothes
- University of Miami
- Niki Spitzer
- Meireese International Links/Meireese Country Club & Charlie Delucca III
- Allyson Feiler
- Stacey Watkins
- Donna Levine Fine Jewelry and Gifts
- Miyako Japanese Restaurant
- Linda Griffith
- Supershine
- Eliott Hubbard
- Ocean7 Watch Company and Almautic
- Jewelry by Jan
- Donald J. Pliner
- Perricones
- Cherie Portesy from Green Apple Haircutters
- Morton's Steakhouse
- Millionaire Gallery, INC.
- David Young
- The Filling Station
- Jessica Zelman
- White Lion Cafe and Antiques
- Jorge Padron
- John Vanik
- Pinecrest Health and Fitness

**Get Involved**

Mail JSIMF
PO Box 420596
Miami, Florida 33242

Email: JSIMF@jsimemorialfund.org

Download Sponsorship form

**Special Thanks To**

Samuel Ullman, Esq.
Michael Mermelstein
David Farkas
Benjamin Farkas
Alexandra Holtfer
Kim Foster Design
Legal-eze Litigation Consulting & Graphics

**Archives**

2013 Sponsors & Donors 2011 Sponsors & Donors
2010 Sponsors & Donors
2008 Sponsors & Donors

**CTRADA**

Multidimensional Family Therapy Program

Copyright, 2013, Contact Site Admin



Home     The Joseph Samuel Isicoff Memorial Fund     Stories     The Board

# Archives: 2013 Sponsors & Donors

We had another wonderful, successful event, thanks to all of your support. We want to especially thank our sponsors and auction donors, all of whom are identified below, with a special thanks to our event Host Sabadell United Bank.

## Sponsors

### Shining Stars

- ABC/Svinga Bros. Corp
- Robert L. Shelley

### Shooting Stars

- Bill Brandt and Development Specialists, Inc.
- Exotech, Inc.
- Isicoff, Ragatz & Koenigsberg
- Steven and Laurel Isicoff and Family
- Mark Raymond

### Rising Stars

- All Florida Scrap Metal, Inc.
- Genovese Joblove and Battista
- The Edelman Family
- The Farkas Family
- Howard Liddle and Gayle Dakof
- Julie Feigeles
- Kahn/Carlin & Co., Inc
- Irving and Rhoda Isicoff
- Kozyak, Tropin & Throckmorton
- Maxmak Industrial, Inc.
- NCF Insurance/Lucy Zelman's Learning Center
- Paula Wayne
- Paul Steven and Marte V. Singerman
- The Ruiz Family
- Brian and Meryl Spector

### Starlight

- Richard Bermont
- Carol and Bill Berk
- The Crabtree Family
- ELG Metals, Inc.
- The Feiler Family
- Stuart Grossman
- Jay Koenigsberg
- Jane McMillan
- Marjie and Tom Neslon
- Nelson & Nelson, PA
- Philip Parish and Jody Lehman
- Len and Diane Pinchuk
- Joseph and Cheryl Rosen
- Neal and Vicki Roth
- Sagre Law Firm, P.A.
- The Sand Family
- Alison and Felix Schterk
- Service Aluminum Corporation
- Jan H. Spitzer
- Harley and Sherry Tropin
- Anonymous

## 2013 Raffle Items

- Sports Ticket Package, A ticket for you and one friend for each of the following games:

  1. Miami Dolphins (Club Seats)
  2. Miami Marlins (Up Front and Personal)
  3. Miami Heat (Lower Level)
  4. 'Canes Football - 4 tickets in the UofM box for the Georgia Tech game
  5. Florida Panthers
     - Actual dates determined after schedules are released.
     - Approximate Value $1500
- iPad Mini, Approximate Value $400
- Case of Wine, Approximate Value $500

## In Kind Donors

- David Farkas
- The Florida Panthers
- Guy Harvey, Inc,
- Landon Krem,
- Emily Maza
- Legal-Eze Consulting and Graphics
- The Miami Marlins
- University of Miami Hurricanes

Updated May 31, 2013

**Get Involved**

Mail JSIMF
PO Box 420596
Miami, Florida 33242

Email: JSIMF@jsimemorialfund.org

Download Sponsorship form

**Special Thanks To**

Samuel Ullman, Esq.
Michael Mannelstein
David Farkas
Benjamin Farkas
Alexandra Haime
Kim Foster Design
Legal-eze Litigation Consulting & Graphics

**Archives**

2013 Sponsors & Donors 2011 Sponsors &
Donors
2010 Sponsors & Donors
2009 Sponsors & Donors

**CTRADA**

Multidimensional Family Therapy Program

Copyright, 2013, Contact Site Admin

# EXHIBIT
# 5

The Joseph Samuel Isicoff Memorial Fund
Contributions

| Name | Attorney? | Law Firm | "X" if Practice Area Includes Bankruptcy | Years Contributed (2009,2010, and/or 2013) |
|---|---|---|---|---|
| Adorno & Yoss | Yes | | X | 2010 |
| Brandt, Bill | No | | President of Development Specialists, | 2010, 2013 |
| Feigeles, Julie | Yes | Kopelowitz Ostrow | X | 2009 2010 2013 |
| Feldman Gale P.A. | Yes | | Intellectual Property | 2010 |
| Gamberg and Abrams | Yes | | X | 2009 |
| Genovese Joblove and | Yes | | X | 2013 |
| Grossman, Stuart | Yes | Levine Kellogg Lehman Schneider | X | 2013 |
| Isicoff Ragatz & Koenisberg | Yes | | X | 2009 2010 2013 |
| Koenigsberg, Jay | Yes | Isicoff Ragatz & Koenigsberg | X | 2010, 2013 |
| Kozyak, John W. | Yes | Kozyak Tropin Throckmorton | X | 2009 2010 2013 |
| Legal-eze Litigation | No | | Courtroom equipment; litigation | 2009 |
| Markowitz, Jerry | Yes | Markowitz Ringel Trusty + Hartog | X | 2010 |
| Maza, Emily | No | Isicoff | X | 2013 |
| McMillan, Jane | Yes | Stokes McMillan Antunez, P.A. | Tax/Estate Planning | 2013 |
| Meland Russin & Budwick, P.A. | Yes | | X | 2010 |
| Mermelstein, Michael, CPA | No | | CPA | 2009 |
| Mora, Dino and Mindy | Yes | Bilzin Sumberg Baena Price & A | X | 2010 |
| Nealon, Marjie | Yes | Bilzin Sumberg Baena Price and | X | 2013 |
| Nealon, Tom | Yes | Lennar Partners, Inc. | X | 2013 |
| Nelson and Nelson, P.A. | Yes | | Asset Protection Planning | 2013 |
| Parrish, Philip | Yes | Philip D. Parrish, P.A. | Appellate Law | 2013 |

The Joseph Samuel Isicoff Memorial Fund
Contributions

| | | | | |
|---|---|---|---|---|
| Raymond, Mark | Yes | Broad & Cassel | X | 2013 |
| Redmond, Patricia | Yes | Stearns Weaver | X | 2009 2010 |
| Rice Pugatch Robinson | Yes | | X | 2009 |
| Rosen, Joe and Cheryl | Yes | Pollack and Rosen, P.A. | X | 2010 |
| Sagre Law Firm, P.A. | Yes | | X | 2009 |
| Schantz, Larry | Yes | Aaronson Schantz & Beiley, P.A. | X | 2009 |
| Singerman, Paul | Yes | Berger Singerman | X | 2009 2010 2013 |
| Spector, Brian and Meryl | Yes | Mediator | X | 2013 |
| The Crabtree Family | Yes | Crabtree and Auslander | Appellate Law | 2013 |
| The Leshaw Family | Yes | James P. S. Leshaw Law | Dispute Resolution | 2009 |
| Tropin, Harley and Sherry | Yes | Kozyak Tropin Throckmorton | X | 2013 |
| Young, David | Yes | David H. Young Law | Mediator | 2009 2010 |

# EXHIBIT
# 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CIV. ACTION NO.: 15-22380 KMM
L.T. Case No.: 13-14289- RAM

SAMUEL D. ROSEN,
Appellant,
v.
THOMAS L. ABRAMS,
Appellee.[1]

CONSOLIDATED APPEAL FROM ORDERS OF THE U.S. BANKRUPTCY
COURT OF THE SOUTHERN DISTRICT OF FLORIDA

**APPELLANT, SAMUEL D. ROSEN'S REPLY BRIEF**

**Douglas C. Broeker, Esq.**
Florida Bar No. 306738
**SWEETAPPLE, BROEKER & VARKAS,
P. L.**
44 W. Flagler Street, Suite 1500
Miami, Florida 33130
Tel.: (305) 374-5623
docservice@broekerlaw.com
doug@broekerlaw.com
*Local Counsel for Appellant*

**R. David Ware, Esq.[2]**
Georgia Bar No. 737756
*Pro Hac Vice* Admission
**ICHTER KRESKY & ASSOCIATES,
LLC**
3340 Peachtree Road, Suite 1530
Atlanta, Georgia 30326
Tel.: (404) 869-5248
dware@ichterkresky.com
*Lead Counsel for Appellant*

---

[1] The Ft. Lauderdale Bridge Club, Inc., Debtor in this bankruptcy proceeding has not appeared in either the Bankruptcy Court regarding the motions and Orders under review, or in the appeal before the District Court herein.

[2] On Friday, December 14, while at the Atlanta Airport, Mr. Ware received notice that the Court had denied his motion for an extension of time to file this Reply Brief. He was then on his way out of town for four days for another case. He has not had an opportunity to properly discuss the facts with his client, nor to review most of the relevant documents, and has no input into this Brief. Accordingly, Mr. Ware has respectfully declined to sign this brief.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................. 4

   THE ONE DISPOSITIVE FACT ON THIS ENTIRE APPEAL .................. 4

   I.   Rosen's April 7 Letter To The Bridge Club Does Not Constitute A Breach Of The Rosen Settlement's Release Provisions ................................. 6

      *a.  Derivative Action* ................................................................... 6

   II.  The Bankruptcy Court Erred In Relying Upon The Plan To Find Rosen In Breach ....................................................................................... 10

   III.  The Fee Award To Abrams Must Be Vacated ...................................... 11

   IV.  In No Event Is Abrams Entitled To Attorney's Fees For His Own Time Because He Is Pro Se.  Rather, Rosen Is Entitled To Recover His Attorney's Fees ............................................................................................. 13

   V.  Appellant Has Standing On This Appeal Of The Injunction That Abrams Obtained Against The Club And Its 1,000 Plus Members and Former Members 17

   VI.  Appellee's Assertion That Appellant Lacks Standing To Contest The 1350 Order Is Without Merit ................................................................... 18

   VII. Abrams Ought Not Be Allowed To Succeed In His Scheme To Place The [D.E. 1350] Order Beyond Appellate Review .............................................. 20

CONCLUSION ............................................................................................. 21

CERTIFICATE OF COMPLIANCE ............................................................. 22

CERTIFICATE OF SERVICE ...................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Abusaid, Jr. v. Hillsborough County Bd. of County Com'rs*, 803-CV-904-T-TBM, 2008 WL 2329409, at *3 (M.D. Fla. 2008).............................................................14

*Alario v. Miller*, 354 So. 2d 925 (Fla. 2d DCA 1978)............................................10

*Albritton v. Ferrera*, 913 So. 2d 5 (Fla. 1st DCA 2005) .........................................13

*Hussein v. Gonzales*, 474 F. Supp. 2d 1265, 1269 (M.D. Fla. 2007) ......................14

*In Re Nica Holdings, Inc.*, 2015 WL 9241140 (11th Cir. 2015) ................................5

*Joseph Wortley v. Chrispus Venture Capital, LLC*; No. 13-11666 (11th Cir. 2014) .5

*Kay v. Ehrler*, 499 U.S. 432 (1991) .........................................................................14

*Massengale v. Ray*, 267 F.3d 1298 (11th Cir. 2001) ...............................................17

*Torres v. State*, 43 So. 3d 831, 832 (Fla. 1st DCA 2010).........................................12

*Zolin v. Goldrush77.com*, 3:07CV538/RV/EMT, 2009 WL 369932, at *3 (N.D. Fla. 2009) .............................................................................................................14

## Statutes

Florida Statutes § 617.07401 ......................................................................... 6, 10, 12

## Rules

Rule 4-3.3.....................................................................................................................8

## Treatises

13 W. Fletcher, Cyclopedia of the Law of Private Corporations s 5953 (rev. ed. 1970) ........................................................................................................................10

## INTRODUCTION

The Answer Brief of Appellee ("Appellee" or "Abrams") is notable for:

1.     Its complete failure to address critical facts set forth in Appellant's Opening Brief, e.g., Rosen's May 6 letter (quoted in Op. Br. at p. 20) which should have ended this entire dispute and would have if, in response to Rosen's question, Abrams had responded "yes, the Bridge Club released me."  This critical letter Abrams ignores hoping that by some alchemy of silence, this Court will overlook it and will decline to vacate the breach Order [D.E. 1351] and the attorney's fee award [D.E. 1371], both on the grounds that the entire proceeding below was unnecessary, was makework, and should never have happened; given the May 6 letter, Abrams' response would have ended the matter so that there could be no justiciable controversy left for the Court to hear.

2.     Its presentation to the Court through the first six and one half pages of essentially, a "knee-capping" recitation of supposed facts, many of which appear without citation to the record – because they are not in the record – and are, in almost every line, every sentence, false or deceptive half-truths.  Constrained by time and the spatial restraints of 15 pages, Appellant is unable to fully respond to this diatribe, nor should he, given that the entirety of this is totally irrelevant to the issues at bar,

and therefore notes only a couple of examples which conclusively show Appellee's

counsel's extreme liberties with the truth which permeates Appellee's entire Brief.[3]

    3.    With the benefit of new counsel, the Appellee treats this Court to a

"then and now" approach to truth.[4]

---

[3] E.g., accounts of Rosen's barrage of litigation against the Bridge Club (Ans. Br., at pp. 2-3), Rosen brought exactly one case against the Bridge Club – in 2010 arising out of his expulsion. The cases he brought in 2011 and 2012 were both derivative actions under Ch. 617.07401brought in the name of and for the exclusive benefit of the Bridge Club against the Officers and Board Members who were, *inter alia*, stealing money. Thus, this bankruptcy, from day one, is the product of those very defendants: being sued; hiring Abrams to put the Bridge Club into bankruptcy - and invoke the automatic stay for the benefit of the *defendants* to stop the Bridge Club's lawsuits against them. Next, the Bridge Club's Board did not decide to seek a Ch. 11 trustee (Ans. Br., p. 3). To the contrary, the Board authorized Abrams to move to lift the automatic stay and go to mediation with the Club's insurer to determine the amount of Rosen's claim. That is the motion Abrams made on August 2 [D.E. 19], consented to by Rosen, and brought on for hearing on August 16. Then, at that hearing, Judge Ray, for his own purposes, *denied* the agreed motion to lift stay, saying that the case needed a Ch. 11 trustee and Abrams, with no authority from the Board, promptly agreed, offering to Judge Ray what a great idea it was (see Transcript, [D.E. 69]). Further, Appellee argues (Ans. Br., pp. 5-6) the application of the Injunction Provision of Section 18 of the Rosen Settlement Agreement despite that, below, his motion for breach against Rosen contained a request for an injunction, contingent on a refund of the settlement funds, etc., all of which the lower court denied, expressly holding that the only relief granted was a determination of breach and the fee award. Having not cross-appealed, Appellee's presentation of this is improper.

[4] As to "then" both in motions before the Bankruptcy Court and before this Court, Rosen charged Abrams with bankruptcy fraud in omitting Debtor's considerable real estate holdings from the schedule in its Ch. 11 Petition, Abrams' one and only defense/response was that the trustee (appointed three months after the filing) is the one who should have corrected the schedule. *See*, [D.E. 36] at ¶10. The "now" is that the schedule is accurate because "the Debtor leases its real property from the City of Ft. Lauderdale and the public records show that the Debtor owns no real

property at the time [the schedule] was filed." (Ans. Br., at p. 24, fn. 22) (emphasis added). First, Appellant is submitting and asks the Court to judicially notice the public record, that 9 days before filing the Petition, Debtor did, on February 17, 2013, file its tax return for calendar year 2012, that the return was signed by the treasurer and the CPA preparer; that it claims it had been approved for filing by each and every Member of Debtor's Board; that it claims that as of December 31, 2012, it owned land valued at $45,000, a building valued at $405,000, and leasehold improvements valued at $45,000 (see, 2012 tax return at bates label T1 002518); and that it claimed depreciation deductions on the building not only in 2012, but for all prior years (see, T1 002515). And if this were not enough to show Appellee's counsel's "now" style of advocacy, the Court can look at the actual lease from the City to the Club which Abrams correctly notes (Ans. Br., p.2) runs to 2040 and explicitly and clearly provides that what the City is leasing to the Club is only the parcel of land upon which the building stands (not the other "land" the Club owns per the 2012 tax return) and the Club **OWNS** the building which it built, it paid for and is depreciating, for the entire term of the lease. Was Abrams not aware of this? If the court looks at [D.E. 21] it will find a motion filed by Abrams on April 4, 2013, asking the Court to approve the lease and the lease is attached to it and paragraph 8 puts the lie to Abrams' "now". Another "then" relates to Rosen's repeated allegations before this Court that Abrams committed outright fraud by concealing Section 9.7 of the Plan both in his motion papers [D.E. 1343, 1344] and in the June 9 argument before the Bankruptcy Court. The only response Abrams ever offered was that when Rosen found out about Abrams' fraud, Rosen should have moved Judge Isicoff for rehearing. See, [Doc. 35] at p. 10, fn. 7. The "now" is that the Trustee in fact released Abrams on behalf of THE Bridge Club, as counsel for the Debtor, thus satisfying Fla. Bar Rule 4-1.8(h) (Ans. Br., at p. 22). Of course, there is no support for this on the record and the Trustee, who was discharged upon the approval of the Plan, has never said any such thing, not even when he appeared at the June 9 hearing to support Abrams' motion. To the extent the "now" is that the trustee released Abrams as counsel for the Debtor in Section 9.6 of the Plan, then why is Section 9.7 in the Plan, at all, as to the Debtor. The "now" is a disingenuous 11th hour attempt by Appellee's counsel to manufacture a release which is not in the record here.

3

## ARGUMENT
## THE ONE DISPOSITIVE FACT ON THIS ENTIRE APPEAL

There is one issue which informs and requires vacatur of all three Orders on this appeal.  It is Abrams' fraudulent concealment of Section 9.7 of the Second Amended Plan [D.E. 1285]:

1.      As to the breach Order [1351], Abrams' motion papers [D.E. 1343] and his June 9 oral argument [see, D.E. 1374 throughout] offered, in addition to the Rosen Settlement Agreement, Section 9.6, 9.8 and 9.9 of the Plan and, critically, Judge Isicoff expressly ruled that she was relying on these provisions of the Plan – along with the General Release provision of Section 7.2 of the Rosen Settlement (see [D.E. 1374] at pp.47-49) despite that ¶10 of the Rosen Settlement expressly provides that Rosen cannot file any papers in the ongoing bankruptcy proceeding and that anything occurring in the bankruptcy post-Rosen Settlement "cannot affect Rosen's rights and obligations under this Agreement."

2.      As to the [D.E. 1371] Order of attorney's fees, it follows from the [1351] Order of breach so that if the latter fails, then former follows; and

3.      As to the [1351] injunction Order, that obviously must fall on the clearly established fraud of asserting 9.6, 9.8 and 9.9 while concealing Section 9.7.

First, as to the breach Order here, the Court erroneously relied on the Plan to find breach in disregard of Section 10 of the Rosen Settlement.  That Order must be vacated and either dismissed with no remand because that the writing of the April 7

4

letter is not violative of the Rosen Settlement or, at a minimum, remanded to the lower court for a determination of whether Rosen breached without reliance upon or reference to the Plan.  Further, Abrams' purposeful fraudulent conduct ought summarily bar him from any relief.  Here, that Abrams' conduct in concealing Section 9.7 was with premeditation, is apparent from the following:

taken by Rosen, and based upon Abrams' claim of release per Section 9.6, Rosen

withdrew the letter at the hearing [D.E. 1374, p. 53]. Writing a letter in a derivative

capacity cannot breach a personal release. As the court in *Alario v. Miller*, 354 So.

2d 925 (Fla. 2d DCA 1978) stated, citing 13 W. Fletcher, Cyclopedia of the Law of

Private Corporations s 5953 (rev. ed. 1970):

> The action is not to establish a personal right. Stockholders are
> permitted to sue ex necessitate rei, and although by the record the
> corporation may be made a party defendant, the stockholder
> bringing the action is in fact its representative. Otherwise than in
> name the action is by the corporation, and if relief be obtained it
> belongs, not to the stockholder bringing the action, but to the
> corporation. **The cause of action belongs to the corporation
> and not to the stockholders individually** or collectively, and
> hence the decree ordinarily must award relief to the corporation
> rather than to the actual plaintiff.

*Alario v. Miller*, 354 So. 2d 925, 927 (Fla. 2d DCA 1978) (emphasis added).

Thus, If Rosen was hired as an attorney to bring a lawsuit against Abrams for

Joe Smith – could Abrams claim that Rosen's appearance as an attorney filing a

lawsuit against him is barred by the release claim? Of course not. Likewise, if Rosen

were a Trustee or an Administrator of some fund and brought a claim, and he was

the named Plaintiff, Rosen as the Administrator of this fund against Abrams would

not be barred from bringing suit because he does not have any interest in it, he's

purely the fiduciary. The same is applicable here.

Rosen exercised his First Amendment right and a right given to him as a

member at the time under Florida Statutes § 617.07401 to request the Bridge Club

sue Abrams for malpractice. That request is not violative of a release, and is a constitutionally protected right, of not only free speech but a right secured under a state statute. This request was made on behalf of what Rosen thought was a party capable of bringing a lawsuit. Rosen was not aware that the Bridge Club was a party to an alleged release whereby it waived all claims against the Appellee. Had Abrams responded to Rosen's May 6th letter raising that very same issue, Rosen surely would have been as gullible and believing as the Court was when Abrams represented this to her.

The Release, signed by Rosen can only be, by definition, of claims he had or might have had against Abrams. Rosen could not "release" the Bridge Club's claims against Abrams no more than he could have released, e.g., Abrams' landlord's claim for non-payment of rent. The claims released by Rosen are claims that Rosen may have had against Abrams. The Release cannot be intended to include claims not held by Rosen himself.

To interpret the Release as barring Rosen's April 7th letter to the Bridge Club requesting it sue Abrams is a suppression of Rosen's First Amendment right of free speech and his right as a former member of the Bridge Club secured by Fla. Stat.§ 617.07401. And even assuming, *arguendo*, that both rights are capable of being waived by Rosen, same would have required a clear and explicit waiver in the Release, e.g. "and Rosen agrees not to ask the Bridge Club or anyone else to sue

8

Abrams, nor will he do so derivatively." "An effective waiver of a constitutional right must be knowing, voluntary, and intelligent." *Torres v. State*, 43 So. 3d 831, 832 (Fla. 1st DCA 2010).

The interpretation of the Release clause by the Bankruptcy Judge and, specifically, that the April 7th letter, in and of itself, constitutes a breach, means that Rosen, on behalf of himself "and all those claiming by or through him", including on behalf of the Bridge Club, had the power to release Abrams for liability to the Club. That is pure folly.

Appellant's counsel have researched the issue exhaustively and can find not a single case in state or federal court where a claim of breach of a release was asserted before the filing of a lawsuit. The reason appears simple. A Release is a defensive weapon which springs to life when a claim or demand that was released is asserted against the released party. And at that point, the Release, being an affirmative defense, must be pleaded or waived. If pleaded, it is subject to being overcome on several grounds, e.g., failure of consideration, released party breached first, fraud, etc. and critically, such matters are not decided in a vacuum days or years before a suit is filed implicating the Release. It is only when suit is filed that one can determine that the Release is in play and the grounds *then existing* to overcome it.

By definition, then, a Release does not give rise to a claim of breach, nor does it give rise to any pre-suit remedy like an injunction. The Released party always has

a complete remedy at law – wait to get sued and then assert the Release and claim attorney's fees (e.g., per Section 17 of the Rosen Settlement), and/or sanctions. There is no need for pre-suit relief in the form of a claim of breach and that is obviously why no such case has been found.

## II.    The Bankruptcy Court Erred In Relying Upon The Plan To Find Rosen In Breach

The lower court's reliance on the Second Amended Plan was improper and therefore requires remand for determination of whether Rosen breached without evaluating the Second Amended Plan.

An abuse of discretion "can occur in three principal ways: [1] when a relevant factor that should have been given significant weight is not considered; [2] when an irrelevant or improper factor is considered and given significant weight; and [3] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005).

Here, the lower court gave significant weight to the Second Amended Plan, an improper and irrelevant factor. "The inclusion of an improper factor in reaching a discretionary decision is grounds for remand." Jen Hung Ng v. I.N.S., 804 F.2d 534, 539 (9th Cir. 1986). Specifically, the lower court held:

> With respect to derivative actions, the claim of the bridge company against Mr. Abrams, to the extent that they weren't resolved by the settlement and separate releases that were

10

exchanged by and amongst various parties, **the bankruptcy plan** made very clear that in exchange for significant consideration that was discussed at the confirmation hearing, which, Mr. Rosen, you did not participate in, because that was one of the promises. . . The plan very clearly released Mr. Abrams, as well as others, with respect to anything that occurred prior to the confirmation date. **So between the releases and the confirmation of the Chapter 11 plan**, any claims or causes of action that the debtor, Fort Lauderdale Bridge Club, would have had against Mr. Abrams, if any, were released. . . **So, Mr. Rosen clearly, both by virtue of the very comprehensive releases that were executed and, moreover, by the release of the Fort Lauderdale Bridge Club**, has absolutely no standing whatsoever to bring an action. So the question then becomes whether the settlement agreement was breached, and the answer is, yes, it is clear that the settlement agreement was breached by you, Mr. Rosen. While I appreciate and hear your arguments that you had no idea that the Bridge Club had released Mr. Abrams, as Mr. Abrams points out and putting aside whatever did or did not occur between the two of you outside of this courtroom and outside of the pleadings that were filed and brought us here today, those pleadings made clear that the **plan** released Mr. Abrams.

[D.E. 1374 pp.47-49] (emphasis added). It is clear that the lower court improperly relied on the "plan" to determine that Rosen "breached" the Rosen Settlement Agreement. The language the lower court relied heavily upon is not within the Rosen Settlement Agreement but in the plan that Rosen was not a part of.

III.  **The Fee Award To Abrams Must Be Vacated**

Judge Isicoff improperly appointed herself Abrams' fee expert witness and decided the amount of his fee request despite not knowing that Abrams was charging Rosen for all of his time spent on the second, injunction, motion against the Club.

11

*See, intra.* In his Answering Brief, Appellee resorts to problematic advocacy with statements such as "Rosen failed to object to Abram's request for attorney's fees before the court below and therefore cannot now [do so]". We are unable to discern any possible basis in fact for Abram's argument and note only:

a.     The Court, in its [1351] Order, allowed Rosen to file an "objection" and obtain a hearing. The court did not require a pleading, a brief, or any explication beyond the simple "objection."

b.     In fact, Rosen went a lot further than he had to in his objection [DE 1365] and specifically set out as grounds: (1) Abrams is not entitled to any fees; (2) That most of what Abrams claims in time spent and fees were neither reasonable nor necessary; (3) That Abrams' statement of time and fees are inflated; and (4) That Abrams is barred from any recovery by the doctrine of unclean hands

In addition, Rosen expanded, providing documents and specifics in his Affidavit (DE 1391), and in Appellants' Opening Brief to this Court, and asserted these very same issues/objections to Abrams' fee award.[8] *See,* Opening Brief at pp. 4-5, 11-13, and 22-23. So much for Abrams' waiver claim.

---

[8] That affidavit also describes Rosen's telephone discussion with Abrams who admitted that the fee statement he submitted charged Rosen for every cent of the entire proceeding including time spent relating to the [D.E. 1344] motion for injunction under the Plan, despite that Rosen was not a party to that motion and despite that only the Rosen settlement, *not* the Plan, has an attorneys' fee provision.

Abrams also asserts that Rosen has not addressed any issue as to the Order which determined the amount of fees (DE 1371) and, according to Abrams "abandoned such issue on appeal", citing to the *Access Now Inc. v. Southwest Airlines Company*, 385 F. 3d 1324 (11th Cir. 2004). Here again, Appellee is wrong. *See* pages of Opening Brief cited above. Respecting Abrams offer of the *Access Now* case for the proposition that an issue not preserved on appeal is waived, the principle is unremarkable but the case has nothing to do with what happened here. In *Access Now*, the Plaintiff, in the court below, proceeded on a claim and particular theory of recovery. When it failed, the plaintiff switched gears in the appellate court, abandoned the original claim and instead argued to the appellate court an entirely new and different claim. The Circuit rejected such tactics but what relationship that has to the case at bar is not discernable. Suffice it to say that Appellant here has been consistent in his claims, theories of the case, defenses, etc. throughout these proceedings.

IV. **In No Event Is Abrams Entitled To Attorney's Fees For His Own Time Because He Is Pro Se. Rather, Rosen Is Entitled To Recover His Attorney's Fees**

To the extent this Court needs to reach the question of Abrams' attempts to recover "attorney's fees" for his own time, acting pro se, in either the bankruptcy

13

proceedings or on this appeal, it must find that he is barred by the principles of *Kay*[9] and its progeny.  First, the only basis for Abrams' claim below and here is Section 17 of the Rosen Settlement which provides for a "loser pays" attorney's fees, an entitlement which does not exist under the Plan or the motions brought to enforce it. And pursuant to Section 16 of the former, this "enforcement" proceeding is governed by Florida law.

Were this issue to be decided under *Kay* and other federal cases pursuant to federal law, Appellant's opening brief shows that Abrams gets nothing.  Abrams' Answer Brief does not disagree but argues that the result is different under state law. In support, Abrams offers (at pp. 17-18), three Florida State Court cases allowing a *pro se* party to receive attorney's fees, all of which pre-date *Kay*.[4]  The only state court case Abrams offers post-*Kay* is *Albritton*.[10] There, however, *Kay* is not even addressed so it is of no avail in answering the question of whether the Florida State Courts do or do not follow *Kay*.

Appellee's research however, appears to have overlooked the 1995 decision of the 3rd DCA in *American Reliance*.[11] There, the lower court had awarded a pro se

---

[9] *Kay v. Ehrler,* 499 U.S. 432 (1991).

[10] *Albritton v. Ferrera,* 913 So. 2d 5 (Fla. 1st DCA 2005).

[11] *American Reliance Insurance* Co. v. *Nuell, Baron & Polsky,* 654 So.2d 289, *290* (Fla. 3d DCA).

attorney both the actual time fee as counsel fees plus a multiplier. On appeal, the appellant did not challenge the *pro se*'s entitlement to its attorney's fees but rather, only challenged the multiplier. *Id.* at 290, fn. 2.

The 3rd DCA first acknowledged and embraced the Kay principle, "We find instructive the views of the United States Supreme Court in *Kay*…" and, in particular, the general principles of *Kay* followed and applied by the federal courts to all kinds of cases (*see*, Appellant's Opening Brief at pp. 22-23) that speak strongly against any *pro se* party, most particularly a lawyer.

Fully embracing *Kay*, and endorsing with approval the use of Kay's progeny, the 3rd DCA concluded:

> "If we were to authorize a multiplier for attorneys who represent themselves, we would create an extraordinary incentive for attorney self-representation. As *Kay v. Ehrler* explains very well, such attorney self-representation should be avoided. Consequently, we reverse the award of a multiplier." *Id.* at 290.

As the Court also noted, there the Appellant did *not* challenge the *pro se* party's entitlement to fees, but appealed only the multiplier. Thus, it was only the multiplier that was reversed.

But *American Reliance* is not the only case which seems to have eluded Appellee's experienced counsel. In *Massengale v. Ray,*[12] the 11th Circuit had before

---

[12] *Massengale v. Ray*, 267 F.3d 1298 (11th Cir. 2001).

it a decision of the Southern District of Florida (Ungaro-Benages, J.) awarding attorney's fees as a Rule 11 sanction to a pro se party in an *Erie* diversity case. Citing *Kay*, the Circuit first referenced its own earlier decision in *Ray v. United States Dep't of Justice*, 87 F. 3d 1250 (1991) holding that the principles of *Kay* applied equally to fee awards under other statutes, i.e., FOIA. *Id*. at 1302. Applying Kay to this diversity case, the Court then concluded:

> "Because Kolner did not incur legal fees as a cost or expense in representing himself, the district court erred in awarding $25,000 in attorney's fees to Kolner as a sanction upon Massengale." *Id*. at 1303.

Appellee's research apparently also overlooked *Zolin v. GOLD RUSH*.[13] There, a California attorney, acting *pro se*, brought suit against a Florida defendant in an *Erie* diversity case in Florida federal district court.[14] Citing *Kay*, the court held that the plaintiff's attorney could not plead to recover attorney's fees in this diversity case under Florida law.

Thus, Florida state and federal court cases decided under Florida law and after *Kay* have followed it and thus, Abrams is not entitled to any attorney's fee award in

---

[13] *Zolin v. Goldrush77.com*, 3:07CV538/RV/EMT, 2009 WL 369932, at *3 (N.D. Fla. 2009).

[14] While the decision itself does not clearly state the diversity nature of the action, it does fully set forth the Plaintiff's claims which are all contract claims under Florida law and the pleading in the case, appended to this brief, specifically pleads diversity.

16

this breach of Florida contract case. We note further that the issue of the non-existent "Gamberg & Abrams" is irrelevant here because whether appearing as Abrams *pro se* or Gamberg & Abrams as attorney to Thomas L. Abrams, every bit of time Abrams claims for is his own time (see, D.E. 1354), as was 100% of Abrams' time presented to the Bankruptcy Court in his Final Fee Application [D.E. 76].[15]   And Abrams has never disclosed – and the record is therefore bare – of whether he had an agreement with Gamberg & Abrams to pay it any fee for their supposed representation of him, or whether that supposed firm's partnership agreement addresses this issue even though Abrams' own website posting does not identify him as a "partner" in Gamberg & Abrams, but rather, that he is "associated" with that firm. Based on the filing, Abrams is entitled to recover nothing - zero – of his own time either in the Bankruptcy Court or in this Court, and Rosen is entitled to recover for his real attorney's fees to his real retained attorneys, incurred both in the court below and here.

V.   Appellant Has Standing On This Appeal Of The Injunction That Abrams Obtained Against The Club And Its 1,000 Plus Members and Former Members

Appellee asserts that Rosen has no standing to object to, or collaterally attack the Plan. Appellant agrees and notes that he is not doing so. Appellant is not party

---

[15] And, as the *Massengale* case shows, even if there is a real law firm involved, it is still pro se representation for which attorney's fees are denied.

to the Plan and pursuant to the Rosen Settlement, knew nothing about it.  As of the time Abrams filed his motion against the Bridge Club and argued it on June 9, Rosen had no interest at all in that proceeding.  Rather, Rosen's interest in it and his standing to appeal arose after the June 9 argument when the Court probably mistakenly signed the Order Abrams submitted which included an injunction that, by definition, included Rosen as a "former member" per Ch. 617.07401.  Ironically, had Abrams, who drafted and submitted the Order which the bankruptcy judge signed excluded Rosen form that class of people, Abrams would be correct, Rosen would have no standing.  Unfortunately, Abrams is a victim of his own drafting, in submitting an Order defining the class enjoined, and, to boot, differing substantially from the oral ruling of Judge Isicoff.

VI.    Appellee's Assertion That Appellant Lacks Standing To Contest The 1350 Order Is Without Merit

Here, Appellee's argument begins (Answer Brief. at p. 18) with the contention that "the Bridge Club **appeared** at the June 9th meeting through its president and did not object in any way to the relief sought by Abrams…"  The official transcript, however, [DE 1374] at p. 2 records all the "appearances".  There is no appearance for the Bridge Club, rather there is a notation that Ms. Tate is "also present".  Is this the "appearance" of the Bridge Club that Abrams asserts to this Court?  Further, the transcript also shows that Judge Isicoff was troubled by the **absence** of the Bridge Club.  She noted that as a corporation it can only appear by counsel.  She explicitly

rejected the notion that the presence of Ms. Tate, only one of nine equal board members that together are the governing body of the Club, was an appearance by the Club.

Abrams' brief then asserts that Rosen waived his right to appeal the 1350 Injunction Order because he did not stay for that argument on June 9th. In support, Abrams quotes from the June 9th transcript that Rosen has permission to leave saying "I am not on this one." Curiously, Abrams eschewed any citation to the page of that transcript at which Rosen made the statement. This was not by accident. Abrams quote appears on page 55 of the transcript, 55 pages into the proceeding, and what Abrams fails to inform this Court is that page 22 of the transcript shows *Abrams* telling the Court and Appellant that Rosen was not involved in this second motion, that he had no standing to even address the Court on anything involving the Plan. To recap, first Abrams told Rosen that he has no standing to address Abrams' second motion. Then, 33 pages later, Rosen, accepting what Abrams had said, asks the Court for permission for leave on the grounds that "I am not on this one." Judge Isicoff agrees and excuses Rosen while Abrams stands mute, agreeing *sub silento.* And this is the argument of waiver. Abrams' statement at page 22 of the transcript was undoubtedly right, and at the time, Rosen had no standing. But the instant Abrams submitted an Order and Judge Isicoff signed it, enjoining a class of members

19

and former members, which, by any definition included Rosen, he certainly had standing to appeal.

VII.   Abrams Ought Not Be Allowed To Succeed In His Scheme To Place The [D.E. 1350] Order Beyond Appellate Review

There is no question that Abrams did not merely ignore his Rule 4-3.3 Duty of Candor by arguing sections 9.6, 9.8, and 9.9 of the plan without discussing section 9.7.   His concealment of the 9.7 section which alone doomed his argument was premeditated so that in today's environment, Abrams can expect to be facing a hostile reception when and if this case arrives at the 11th Circuit.  *See e.g. Global Energies, supra*, and the licensure proceedings the Circuit invited the Florida bar to initiate against attorney Pugatch.  Abrams' only hope of trying to avoid a like fate before the 11th Circuit is to attempt to place the 1350 Order beyond meaningful appellate review.  That was, as Abrams had telegraphed (*see* [D.E. 1417]) exactly his plan - to attack Rosen's standing to appeal but first, he had to successfully oppose Ezrin's intervention, which he did and can now turn to part 2 of his plan, to attack the standing of the only remaining person challenging the Order - Rosen.

One can only reflect upon on of the most fundamental principles of our society, a principle that informs the Canons of Judicial Ethics, the JCDR, and the three pronged test for a vacatur of orders post-recusal per *Liljeberg* i.e. the importance of maintaining and ensuring the citizenry's confidence in our judicial system and its impartiality and fairness.  Without confidence in the system and those

who administer it, there is a shredding of the social contract. We certainly do not mean to overstate or suggest that there will be anarchy in the streets if Abrams prevails, but, to be sure, every time a judicial decision reaches the public awareness and is perceived as unfair, there is just a little bit more of the integrity of the courts which is eroded. Appellant urges this Court to not allow Abrams to retain the lucre of his fraudulent conduct in the court below.

## CONCLUSION

For all of the foregoing reasons, appellant respectfully requests:

1.      An Order vacating the lower court's order finding breach [DE 1351], vacating the fee award [DE 1371], awarding to Appellant all of his costs and counsel fees incurred both in the proceedings below and on this appeal, and remanding the matter to the lower court for the determination of said amount;

2.      An Order vacating the lower court's injunction order [DE 1351] and remanding to the lower court with direction to dissolve the injunction and dismiss the action;

3.      For any other or further relief to which appellant is entitled and which this court deems reasonable and appropriate

Dated: December 23, 2015.

Respectfully submitted,

By:      /s/ Douglas C. Broeker
Douglas C. Broeker

21

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

By:     /s/ Douglas C. Broeker
Douglas C. Broeker, Esq.
Florida Bar No. 306738

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case and via Regular U.S. Mail to all parties who are not on the list to receive e-mail notification/service for this case, including the Ft. Lauderdale Bridge Club, on this 23rd day of December, 2015.

By:     /s/ Douglas C. Broeker
**Douglas C. Broeker, Esq.**
Florida Bar No. 306738
Doug@broekerlaw.com
DocService@broekerlaw.com
**SWEETAPPLE, BROEKER & VARKAS, P.L.**
44 W. Flagler Street, Suite 1500
Miami, Florida 33130
Tel.: (305) 374-5623/Fax: (305) 358-1023

22

# EXHIBIT
# 7

Case 1:15-cv-22380-KMM   Document 103   Entered on FLSD Docket 03/04/2016   Page 93 of 102
Case 1:15-cv-22380-KMM   Document 94   Entered on FLSD Docket 12/24/2015   Page 281 of 282
Case 3:07-cv-00538-RV-EMT      Document 8      Filed 03/25/2008      Page 1 of 22

In Pro Per for Plaintiff
DR. ROXANNE V. ZOLIN
c/o  St. James
1215 Woodside Road, Apt. 12
Redwood City, CA  94061
(650) 793-4158

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF FLORIDA

### PENSACOLA DIVISION

| | |
|---|---|
| DR. ROXANNE V. ZOLIN, <br><br> aka  Zolin, Roxanne (CIV) <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH CARUTH, aka <br><br> JOSEPH H. CARUTH, JR., individually, <br><br> GOLD RUSH 77 (an unincorporated <br><br> association), JOSEPH H. CARUTH, JR., <br><br> President, GOLD RUSH 77, <br><br> GoldRush77.com, (an unincorporated <br><br> association), JOSEPH H. CARUTH, JR., <br><br> President, GoldRush77.com, <br><br> Defendants. | Case No.: **3:07cv538/RV/EMT** <br><br> COMPLAINT FOR MONEY DAMAGES & EQUITABLE, INJUNCTIVE, and/or DECLARATORY RELIEF FOR BREACH OF ORAL CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH and FAIR DEALING; FRAUD and DECEIT-INTENTIONAL MISREPRESENTATION OF FACT; EXEMPLARY (PUNITIVE) DAMAGES;  QUANTUM MERUIT; WRONGFUL and/or UNFAIR TERMINATION. |

## AMENDED  COMPLAINT

Plaintiff, Dr. Roxanne V. Zolin, states:

- 1 -

VERIFIED  COMPLAINT  FOR  MONEY  DAMAGES

Case 1:15-cv-22380-KMM   Document 103   Entered on FLSD Docket 03/04/2016   Page 94 of 102
Case 1:15-cv-22380-KMM   Document 94   Entered on FLSD Docket 12/24/2015   Page 282 of 282
Case 3:07-cv-00538-RV-EMT   Document 8   Filed 03/25/2008   Page 2 of 22

**JURISDICTION**

1.  This Court has original subject matter jurisdiction over the instant action under 28 USC §1332 because:

    a.  Plaintiff is an individual who has, at all relevant times herein mentioned, resided in the State of California,

    b.  The individual Defendant, Joseph H. Caruth, Jr., has at all relevant times herein mentioned, resided in the State of Florida; and similarly, the principal place of business of the two defendant companies also named as parties, Gold Rush 77, and/or GoldRush77.com, were located in the State of Florida;

    c.  Accordingly, there is complete diversity of citizenship between Plaintiff and the Defendants, and each of them;

    d.  The matters in controversy exceed $75,000.00, exclusive of interest and costs.

    e.  This Court may properly exercise supplemental jurisdiction over any State law claims herein alleged (28 USC §1367).

**VENUE**

2.  Venue is proper in this Judicial District under USC §1391.

**PARTIES**

3.  Plaintiff Dr. Roxanne V. Zolin, P.O, Box 433, has resided, and/or worked primarily in Marina, California 93933, during the course of the events and/or incidents about which she has complained herein.

4.  Defendant Joseph H. Caruth, Jr., aka Joseph H. Caruth, Jr., President, Gold Rush 77 and Joseph H. Caruth, Jr., President GoldRush77.com has at all

-2-

VERIFIED  COMPLAINT  FOR  MONEY  DAMAGES

# EXHIBIT
# 8

# VERIFIED CHART OF
# ABRAMS' IMPROPER ASSERTIONS OF FACT
# ABRAMS' CONSOLIDATED ANSWER BRIEF

| ABRAMS SAYS | COMMENT |
|---|---|
| 1. The Bridge Club "has operated and managed a highly successful, nationally recognized Bridge Club since 1958 [D.E. 1286]." (Opp., p. 2) | There is no such evidence in the record and, indeed, it was and is vigorously disputed. The document offered to support this "fact" is nothing but the Trustee's hearsay Disclosure Statement in connection with the proposed Plan and is, in no event, admissible against Rosen because he was not a party thereto, and was never served with the Plan or Disclosure Statement because, pursuant to ¶ 10 of the Rosen Settlement Agreement, he had been barred from filing *anything* in the Bankruptcy proceeding and was guaranteed that anything which did occur would not affect him. And per that provision, Rosen was stricken from the service list in the bankruptcy case. |
| 2. The February 26 Bankruptcy filing was "caused by the substantial litigation brought...by [Rosen] against the club and many of its officers..." [D.E. 1286 at 13-14]. Opp., p. 2. | FALSE. Once again, the record cite offered is to the trustee's hearsay Disclosure Statement. The truth is that Abrams filed the Bankruptcy Petition for the improper purpose of invoking the Act's automatic stay provisions to stop pending derivative actions brought in the name of and on behalf of the Club *against* the very Officers who schemed to hire Abrams. The deposition admissions in support appear and are cited to in various parts of the record. *See also*, Rosen Affidavit in Reply. |
| 3. "The initial Trustee resigned" and "in a familiar pattern, Rosen filed a Motion to Remove and Sanction the Successor Trustee and his counsel [ECF cites] (Opp., p. 2) | Here again, the record cite is to the Trustee's hearsay Disclosure Statement. Further, the initial Trustee, Ken Welt, resigned on August 8, 2013 *after* Rosen filed a motion to remove him for perjury, *after* Judge Ray, at an impromptu hearing held on August 7, signaled to Welt that he was going to grant the motion, and *after* Welt realized that if an *Order* were entered removing him for cause, he would be forever barred from ever serving as a trustee again (*See* 11 U.S.C. § 324(b)). Thereafter, it was *Abrams* who motion Rosen and, admitting that *Abrams'* original motion for appointment of a Ch. 11 Trustee was a grievous mistake, and asked Rosen's help and support to avoid the appointment of a successor Trustee.[1] |

---

[1] Rosen's motion to remove the new Trustee on the grounds that the statute did not require any successor Trustee to be appointed (per his agreement with Abrams) also alleged misconduct of the new Trustee which was never denied. That motion was never ruled upon, but rather, ignored, by Judge Isicoff.

1

| | |
|---|---|
| **4.** Rosen "filed an Adversary Complaint against the Trustee and his law firm" [*citation omitted*] (Opp., p. 3). | A half-truth. What Abrams did not disclose is that the Adversary Complaint was for defamation, *not* by the Trustee but by his law partner and law firm for their false and defamatory statement to Rosen's counsel, accusing Rosen of prevailing upon an official Court Reporter to alter an official Transcript of a deposition![2] |
| **5.** "The [Rosen] Settlement Agreement...resulted in the dismissal with prejudice of all derivative claims filed by Rosen in the court cases..." [D.E. 1089] (Opp., p. 3). | False. First, as the evidence of record shows and as Rosen presents in his accompanying Affidavit, his only claim *against* the Bridge Club—filed in 2010—was fully insured by the Club's insurance policy and Rosen was obliged to file a Claim in bankruptcy solely because of the terms of the policy, including that the Carrier's obligation to indemnify/pay arose only after a judgment was entered against the insured. Thus, in truth, the Club had little or no effective exposure to Rosen's damage claims. Further, the real purpose of the bankruptcy filing—which was achieved not by the Settlement Agreement—was the *dismissal* of all of the derivative claims brought on behalf of the Club with no consideration/restitution/damages received by the Club. They were dismissed by the Trustee's successful motions to substitute himself as the nominal Plaintiff therein for Rosen and then to WITHDRAW all of the claims against the Officers without their paying a dime to the Client. |
| **6.** "At the time of the [Rosen] Settlement Agreement, Rosen had...numerous sanction motions [pending] against him." (Opp., p. 3) | Abrams offers no citation to those motions for sanctions filed against him (or for the various motions for sanctions and contempt filed against his counsel) because he does not want this Court to see the overwhelming evidence of an agreement—express or implicit—between Abrams, the Trustee and Judge Isicoff under which Abrams and the Trustee bombarded Rosen with baseless motions,[3] to which Judge Isicoff would find merit, preliminary, and while denying Rosen a chance to even respond (*see* Rosen's March 2014 motion to disqualify Judge Isicoff [D.E. 930].[4] |

---

[2] Trustee's counsel did not deny making this statement and when challenged, could offer no proof that it was true.

[3] These absurd motions included one by Abrams (who had no client at the time and had long ago filed his "final fee application, for a *Martin-Trigona* injunction against Rosen, despite that he had *never*, in all his years of practice, been found to have ever filed a single frivolous motion, let alone a frivolous action. *See also*, the Trustee's motion accusing Rosen of some impropriety because, while appearing in the bankruptcy court *pro se*, he had asked a clerk in Doug Broeker's office to fax something for him to Trustee's counsel, the Trustee citing this as evidence of some egregious misconduct.

[4] Further proof of this scheme of Abrams, the Trustee and Judge Isicoff to bulldoze Rosen into settlement using a barrage of baseless motions is apparent from the transcript of the hearing on the Plan confirmation at which all three congratulated each other for their success in getting rid of Rosen and thus making Confirmation possible. (*see* [D.E. 1373]).

| | |
|---|---|
| 7. Rosen made "two prior post-settlement efforts to evade [the] Settlement Agreement which were futile and contrary to facts alleged in his motion. [ECF 1123, 1223]." (Opp., p. 4, fn. 4). | Totally false. As this Court can see, the Trustee's [D.E. 1123] filing to compel Rosen to produce certain signed Releases was made here when the Trustee breached the Settlement Agreement by refusing to release the settlement funds to Rosen *unless* he signed Releases he was not obliged to sign. Rosen did *not* then seek to vacate the Settlement Agreement but to enforce it by compelling the Trustee's compliance. *See* [D.E. 1169]).[5] And as for [D.E. 1223], even a cursory review of it shows that Rosen did not there seek to *vacate* the Settlement Agreement. Rather, he filed a motion seeking clarification/interpretation of the Agreement and specifically, whether he could file critical, relevant evidence of Abrams' misconduct simply so the Court would be fully informed when considering Abrams' fee application. And as Rosen's filing shows, he could not and did not oppose Abrams' fee motion. Rather, he sought only to assist the Court in carrying out its duty under the Bankruptcy Act and Rules and under the Code of Judicial Conduct for United States Judges to make an independent determination of any fee applications presented, even in the absence of any objection. In short, those representations by Abrams of *two efforts* by Rosen to "evade" the Settlement Agreement are just so much more of Abrams' calculated dissembling and disregard of his Rule 4-3.3 obligation of candor to the Court. |
| 8. Trustee's appellate counsel was obliged to spend $150,000 "in dealing with the Rosen appeals and motion practice relevant thereto." (Opp., at p. 4, fn. 5). | Another half-truth. Appellate counsel repeatedly expended time for wasteful, unnecessary work but was nevertheless paid for it, per Judge Isicoff's approval. By way of example, Rosen had appealed three (3) of Judge Ray's Orders denying relief, including damages, against Welt for his perjury and other misconduct. The successor trustee was not involved in these at all. However, the Clerk's office erroneously named "Tabas", rather than "Welt" as the Appellee in the caption and docket record. Tabas' counsel, Ms. Easley, then moved to strike Tabas' name as Appellee because he had no interest in those appeals. Rosen's counsel, Mr. Broeker, agreed and the presiding judge approved Tabas' removal from those matters but Easley, nevertheless, proceeded to file motions on behalf of the excused Tabas addressed to whether those appeals against Welt were jurisdictionally proper! And this is a substantial part of what Easley charged and was paid for. |

---

[5] Subsequent to the filing, the Trustee and Rosen reached an agreement under which the former *withdrew* his demand for Releases to which he was not entitled under the Settlement Agreement and thus, the dispute was resolved.

| | |
|---|---|
| 9. "The Plan was approved by the bankruptcy court…without objection or opposition." (Opp., pp. 4-5). | A damnable falsehood by inference and innuendo, because Abrams' purpose is to insinuate to this Court that *Rosen* did not object, *Rosen* did not oppose, the Plan. But as discussed above and cleverly not disclosed by Abrams, per ¶ 10 of the Rosen Settlement Agreement, Rosen was barred from filing anything in the bankruptcy case and, in fact, was deleted from the service list and thus, never even served with a copy of the Plan or the proposed (or actual) Confirmation Order. |
| 10. "Mere days after the Final Release was entered on April 3, 2015, and the case closed, Rosen served a demand letter on the Bridge Club [to sue Abrams for malpractice]." (*citations omitted*) (Opp., at p. 5) | Yet another Abrams' specialty of falsity by inference and innuendo. First, Rosen had no knowledge of—and was not served with—the Final Decree. Second, the Final Decree was a mere  formality, Judge Isicoff having approved the Plan, confirmed it and the bankruptcy case was over—ended--including the dismissal of the Trustee, on February 24 [D.E. 1325]. |
| 11. "Abrams moved to enforce the Settlement Agreement as to Rosen…[and this resulted in an Order in his favor]." (Opp., p. 5) | In truth, Abrams, both in his motion [D.E. 1343] and in the oral argument of June 9 [D.E. 1374] moved against Rosen *both* under the Settlement Agreement and under Section 9.6 of the Plan (to which Rosen was not a party, and Judge Isicoff's oral ruling (*see* [D.E. 1374]) specifically granted Abrams motion on *both* grounds, the Court apparently being unaware of Section 9.7 of the Plan which Abrams despicably decided not to disclose. |
| 12. "Rosen proudly proclaims…that Judge Isicoff recused herself to avoid further scrutiny of [her private family charity activities]." (Opp., at p. 5). | FALSE. Rosen never "proclaimed" that, nor, as a member of the profession for over 30 years, could he ever be proud of Judge Isicoff's conduct which is an absolute disgrace. Rather, all Rosen did was to offer his speculation, to ruminate, that his disclosure that he had knowledge of Judge Isicoff's improper conduct may have been the impetus for her Order of Recusal. However, same is not a basis for recusal; it is not Rosen's knowledge of her activities, all of which gleaned from the public record, which would have been the grounds for a disqualification motion by Rosen, but rather, her misconduct spanning her entire 10-year tenure on the bench. |
| 13. "Judge Isicoff did not vacate any [of her] orders at that time (after recusal on August 14—[D.E. 1394])." (Opp., p. 5) | Another bit of deception by false innuendo by the clever Abrams. First, we are aware of no case in which a judge has removed himself or herself, either voluntarily as here or on a motion (as Judge Ray did) and then proceeded to enumerate her prior Orders to be vacated. That task belongs to the successor judge. Second, Judge Isicoff here, quite uncharacteristically,[6] did not offer a clue as to the facts which caused her to |

---

[6] *See, e.g., Sundale* (discussed in [D.E. 380]) in which Judge Isicoff fabricated--and offered—a reason for her recusal which purported to insulate all of her prior Orders from vacatur by dating the grounds for recusal as arriving after she had effectively finished the Ch. 7 case.

| | |
|---|---|
| | recuse herself. Indeed, had Judge Isicoff disclosed that her reason for recusal was her 10 years of improper conduct in soliciting and accepting contributions from the attorneys appearing before her (i.e., bias in favor of the contributing attorneys or, at a minimum, the appearance of same), it would have opened the floodgates to an avalanche of Rule 60(b)(6) motions because the scope of her improper activities taints most, if not all cases over which she has presided. |
| 14. "The assertion that [Abrams'] $500 charitable contribution in any way impacts this case is simply absurd." (Opp. at p. 6, fn. 6). | The issue is **not** the size of the contribution. The real issue is the failure to disclose it, a failure by Judge Isicoff and by Abrams. And as to Abrams' insinuation that this is just an ordinary, everyday contribution by him—nothing unusual—same is singularly inappropriate in that Rosen's discovery demands to Abrams sought information on exactly this subject, i.e., Abrams' philanthropic tendencies, and Abrams refused to make disclosure. Having done so, the notion of asserting his contribution's routine, not unusual characteristic is barred.[7] |
| 15. "Rosen continues to bring up allegations of misconduct already ruled upon by this Court..." (Opp. at p. 7). | This Court has ruled on exactly one allegation of misconduct by Abrams—his "Gamberg & Abrams" charade[8]—and has *never* ruled on Abrams' litany of misconduct in this bankruptcy, including bankruptcy fraud, suborning perjury, use of an unethical retainer agreement, etc., etc. (*see* accompanying Rosen Affidavit). And to that, one can add the endless instances of serious breaches by Abrams of his duty of candor under Rule 4-3.3 (*See* Affidavit and Exhibit 8 thereto) which this Court has itself held would not only support disqualification, but disbarment.[9] |
| 16. "[In the Plan] the Trustee released any claims against the professionals, including Appellee." (Opp. at p. 4). | An outright fabrication. The truth is that "in the Plan", the Trustee *appeared* to release any claims against Abrams via Section 9.6, but in Section 9.7, the Trustee expressly negated such a release. Moreover, where could the Trustee ever get the authority to release the Debtor's claims of malpractice against Abrams? The answer is nowhere, not under the statute, and certainly not under the Florida Bar Rules. |

---

[7] The accompanying Rosen Affidavit attaches, as Exhibit 5, an analysis of contributors from which it is apparent that one would be hard-pressed to identify any attorney/law firm practicing bankruptcy who did not contribute. And, as in the *Bridge Club* case, there appears to have been no disclosure of this financial support either by Judge Isicoff or by the donor, here Abrams.

[8] As this Court will recall, its Order (Doc. 27) in the 22380 appeal—and its Order to Show Cause re Sanctions—were based upon Abrams' filing with the Florida Bar claiming 2-5 lawyers in the Thomas Abrams, P.A. law firm, and the Court improperly taking judicial notice of the truth thereof. As this Court did not note, it was Rosen who first put Abrams' Florida Bar filing before the Court (*see* [D.E. 1391]) and who agreed it was false.

[9] *See P.G. Oil v. Motiva Enters.*, 397 F. Supp. 2d 1359 (S.D. Fla, 2005).

| | |
|---|---|
| 17. "The Florida Bar found no probable cause in regards to a disciplinary complaint against Abrams." (Opp at p. 6, fn. 6). | True, but totally irrelevant. A grand jury's refusal to return a true bill does not prove innocence. Is it no wonder, therefore, that Abrams is unable to cite a single authority for the proposition that a determination not to proceed made by the Florida Bar has any conclusive or estoppel effect at all? |
| 18. Abrams asserts that Rosen knew about Judge Isicoff's conduct back in November 2014, and the information he now offers was available on the Internet. | In November 2014, Rosen had only heard, orally, some hearsay about Abrams' contributing to some fund involving Judge Isicoff. Having been out of the bankruptcy case for several months    and never expecting to be back in her Court, Rosen had no interest in investigating the matter and, indeed, having no computer himself, saw no need to ask counsel to investigate further. Moreover, while this alleged "time delay" might be relevant **if** Rosen had moved to disqualify Judge Isicoff and her denial was the issue now here on appeal, that of course is not the case. There is no time-clock, no laches, no concept of delay, respecting the timing of Judge Isicoff's *sua sponte* Recusal Order. |
| 19. "Rosen also continues to bring up allegations of misconduct already ruled upon by this Court." (Opp. at p. 7). | While it is true that Rosen **attempted** to bring up the facts respecting a variety of Abrams' misconduct, not merely the "Gamberg & Abrams" charade (*see* [D.E. 1414], which was incorporated and attached to Rosen's motion in the District Court, (Doc. 15) in the 22380 appeal), he was thoroughly unsuccessful; in its Order denying Rosen's motion (Doc. 27) this Court addressed only the "Gamberg & Abrams" matter, nothing else, ignoring entirely all of the other misconduct asserted by Rosen. |
| 20. Rosen seeks to vacate "all of Judge Isicoff's prior Orders." (Opp. at p. 10). | Patently false. As Rosen's Rule 60(b)(6) motion in the Bankruptcy Court [D.E. 1415] shows and here on appeal in the 23437 matter confirms, Rosen expressed a clear desire not to punish the innocent, i.e., himself, the Bridge Club, or its members, but rather, to fashion vacatur of the Order confirming the Plan and the Rosen Settlement, as well as other Orders, so as to go after Abrams, the Trustee, and those others who were allowed to rip off the Bridge Club by Judge Isicoff's rubber-stamping of every single fee app presented to her. |
| 21. "Rosen filed his first motion to vacate without first seeking to reopen the bankruptcy case." (Opp. at p. 11). | The appeal Rosen filed to this Court and originally assigned #23549 is, in fact, an appeal from the Order of the Bankruptcy Court denying Rosen's motion to reopen the bankruptcy so as to allow him to assert his Rule 60(b)(6) motion. Moreover, Rosen grows weary of hearing Abrams (and Judge Mark) assert a most remarkable principle of law *sans* a single citation to the statute, the Rules, or a single case, that a motion made under a Rule entitled "Relief From A Judgment Or |

6

| | |
|---|---|
| | Order" cannot be made if a final judgment has been entered. Judge Ray tried to do this same thing to Wortley in *Global Energies*, and we all know what the Eleventh Circuit thought of that! |
| **22.** Vacating any of Judge Isicoff's Orders, including the Plan and the Rosen Settlement, would be unfair and "would clearly doom the Bridge Club and prejudice many parties..." (Opp. at pp. 17-18). | This argument by Abrams evidences the most unmitigated gall one can imagine. The attorney **for the Debtor** who sued his own client for an injunction to protect his own skin without ever resigning as Debtor's counsel (and to this day continuing to appear as Debtor's counsel on the docket sheet and records of the Bankruptcy Court), and who obtained relief against his client via fraudulent misrepresentations of the terms of the Plan while arguing against an empty chair, cannot possibly be heard to today so hypocritically argue for the fairness to which the Bridge Club or anyone else is entitled. As Rosen has made clear in his filings (*see*, e.g., [D.E. 1415]), his intention is to use the vacatur remedy not to "doom" the Bridge Club", but rather to recover for it (and in part for himself) the thousands and thousands of dollars erroneously dispensed by Judge Isicoff to a wealth of undeserving people, starting with Abrams. |

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged

therein are true and correct to the best of my knowledge and belief.

Dated February 16, 2016

_____

Samuel D. Rosen

7